25-1624

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

EPIC TECH, LLC,

Plaintiff-Appellee

v.

PEN-TECH ASSOCIATES, INC.,

Defendant-Appellant

Appeal from the United States District Court for the Northern District of Georgia
in 1:20-cv-02428,
Judge Victoria M. Calvert

## CORRECTED PRINCIPAL BRIEF OF PEN-TECH ASSOCIATES, INC.

Alastair J. Warr
FISHERBROYLES, LLP
203 N. LaSalle Street, #2100
Chicago, IL 60601
(317) 407-5260
Alastair.Warr@FisherBroyles.com

Richard M. Lehrer (RL2498)
FISHERBROYLES, LLP
361 Pharr Rd. NE, Unit 113
Atlanta, GA 30305
(845) 519-9525
Richard.Lehrer@FisherBroyles.com

June 24, 2025

*Counsel for Defendant-Appellant*

# CERTIFICATE OF INTEREST

Counsel for Appellant Pen-Tech Associates, Inc, certifies the following:

1. The full name of all entities represented by undersigned counsel in this case is: Pen-Tech Associates, Inc.

2. The full name of all real parties in interest for the entity is: None.

3. The full name of all parent corporations for the entity and all publicly held companies that own 10% or more stock in the entity are: None.

4. The names of all law firms, partners, and associates that appeared for the entity in the originating court and/or are expected to appear in this court for the entity are Richard M. Lehrer, Alastair J. Warr, FisherBroyles, LLP

June 24, 2025

/s/ Richard M. Lehrer
Richard M. Lehrer (RL2498)
FISHERBROYLES, LLP
361 Pharr Rd. NE Unit 113
Atlanta, GA 30305
(845) 519-9525
Richard.Lehrer@FisherBroyles.com

*Counsel for Appellant*

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST.............................................................i

TABLE OF CONTENTS.................................................................ii

TABLE OF AUTHORITIES ...........................................................iv

STATEMENT OF RELATED CASES..............................................1

STATEMENT OF JURISDICTION ...............................................2

STATEMENT OF THE ISSUES .....................................................4

STATEMENT OF THE CASE..........................................................5

I.   The Infringement Case....................................................5

II.   The Sanctions Motions....................................................6

III.   Epic Tech's Pre-Filing Knowledge ..............................8

IV.   Epic Tech's Post-Filing Knowledge...........................12

SUMMARY OF THE ARGUMENT................................................16

ARGUMENT ...................................................................................20

I.   Standard of Review........................................................20

II.   The District Court Erred by Relying on Epic Tech's Pre-Suit Rule 11 Infringement Inquiry ..........................................22

III.   The District Court Applied the Incorrect Law When Analyzing Epic Tech's Knowledge Under Rule 11 ............................................25

IV.   The District Court Erroneously Relied on Irrelevant Facts and Law to Determine the Originating Case was not Frivolous..............28

V. The District Court Erroneously Relied on Irrelevant Facts and Incorrect Law to Determine the Originating Case was not Exceptional ...................................................................................32

VI. The District Court's Order was Arbitrary and Internally Inconsistent......................................................................................35

VII. Conclusion and Relief Sought ................................................38

ADDENDUM ...................................................................................40

    Order ........................................................................... APPX000001

    U.S. Patent No. 8,454,317........................................... APPX000067

CERTIFICATE OF COMPLIANCE ...................................................81

CERTIFICATE OF SERVICE ...........................................................82

# TABLE OF AUTHORITIES

**Cases**

*Aetna Ins. Co. v. Meeker*, 953 F.2d 1328, 1331 (11th Cir. 1992) ...........24

*Aim Immunotech, Inc. v. Tudor*, No. 23-13576, 2025 U.S. App. LEXIS 7566, at \*7 (11th Cir. Apr. 1, 2025) ................................................29

*Alice Corp. Pty. Ltd. v. CLS Bank*, 573 U.S. 208 (2014) ............... passim

*Amlong & Amlong, P.A. v. Denny's Inc.*, 500 F.3d 1230, 1240 (11th Cir. 2007) ......................................................................................34

*Baldwin Hardware Corp. v. Franksu Enter. Corp.*, 78 F.3d 550, 560-61 (Fed. Cir. 1996) ................................................................................21

*Chester v. Miller*, 906 F.2d 1574, 1578 (Fed. Cir. 1990) .......................27

*Commil USA, LLC v. Cisco Sys.*, 575 U.S. 632, 643 (2015)..............24, 31

*Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1460 (Fed. Cir. 1998) (*en banc*)...........................................................................................21, 32

*Deweese v. United States*, 171 Fed. Cl. 187, 189 (2024) ........................29

*Epic Tech, LLC v. Fusion Skill, Inc.*, 534 F. Supp. 3d 741, 746 (S.D. Tex. 2021) ................................................................................... 13, 34

*Forest Labs., Inc. v. Abbott Labs.*, 339 F.3d 1324, 1329 (Fed. Cir. 2003) ...............................................................................................35

*Gaymar Indus. v. Cincinnati Sub-Zero Prods.*, 790 F.3d 1369, 1372 (Fed. Cir. 2015)......................................................................................21

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.,* 572 U.S. 559, 563 n.2. (2014)..............................................................................................32

*In re Jung*, 637 F.3d 1356, 1362 (Fed. Cir. 2011) ...................................27

*In re Zimmerman*, No. 2023-1542, 2024 U.S. App. LEXIS 3034, at *9 (Fed. Cir. Feb. 9, 2024) ......................................................................27

*Integrated Advert. Labs, LLC v. Revcontent, LLC*, 644 F. Supp. 3d 1031, 1037 (M.D. Fla. 2022) ..........................................................16

*Inventor Holdings, LLC v. Bed Bath & Beyond, Inc.*, 876 F.3d 1372, 1377-78 (Fed. Cir. 2017) ...................................................................37

*Jeneric/Pentron, Inc. v. Dillon Co.*, 171 F. Supp. 2d 49, 77 (D. Conn. 2001) ...................................................................................................27

*Kaplan v. Daimler Chrysler, A.G.*, 331 F.3d 1251, 1255 (11th Cir. 2003) ..................................................................................................25

*McDonald v. Emory Healthcare Eye Ctr.*, 391 Fed. Appx. 851, 852-853 (11th Cir. 2010) ............................................................................25

*Minnis v. Ga. DOL*, No. 5:24-cv-46, 2025 U.S. Dist. LEXIS 79345, at *5 (S.D. Ga. Mar. 24, 2025) ...................................................................29

*Neitzke v. Williams*, 490 U.S. 319, 327, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989) ..............................................................................................29

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1751 (2014) ............................................................................33, 37

*Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1319 (Fed. Cir. 2019) ...............16

*Source Vagabond Sys. v. Hydrapak, Inc.*, 753 F.3d 1291, 1298 (Fed. Cir. 2014) ..........................................................................................20

*Thread Props. v. Title Ins. Co. of Minn.*, 875 F.2d 831, 835 (11th Cir. 1989) ...................................................................................................24

*United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005) ..... passim

*Walther v. McIntosh*, 572 F. App'x 881, 883 (11th Cir. 2014)................17

## Statutes

28 U.S.C. § 1295 (a)(1)..................................................................3

28 U.S.C. § 1927 ................................................................ passim

28 U.S.C. §§ 1331 and 1338(a) ....................................................2

35 U.S.C. § 101 .................................................................. passim

35 U.S.C. § 132(a)........................................................ 26, 27, 34

35 U.S.C. § 285 .................................................................. passim

## Rules

30(b)(6)..........................................................................................38

Fed. Cir. R. 47.5(a) ......................................................................1

Fed. R. Civ. P. 11(c) ......................................................... passim

Rule 11(b).....................................................................................23

## STATEMENT OF RELATED CASES

Other than the originating case from the U.S. District Court for the

Northern District of Georgia, 1:20-cv-02428, there are no related or

prior cases that meet the criteria under Fed. Cir. R. 47.5(a)

# STATEMENT OF JURISDICTION

This is an appeal from a patent infringement action arising under the patent laws of the United States, 35 U.S.C. § 101 *et seq.*, in the U.S. District Court for the Northern District of Georgia ("District Court"). On June 5, 2020, Epic Tech LLC ("Epic Tech") filed a complaint accusing Pen-Tech Associates, Inc ("Pen-Tech") of infringing U.S. Patent No. 8,545,317 (Doc. 1) ("'317 Patent") (the "Originating Case").

The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

On September 24, 2024, the District Court granted Pen-Tech's summary judgment motion, held the claims of the '317 Patent invalid under 35 U.S.C. § 101 (APPX002503 – APPX002525), and dismissed the infringement case.

On July 18, 2024, Pen-Tech filed motions for sanctions pursuant to Fed. R. Civ. P. 11(c) ("Rule 11 Motion"), 35 U.S.C. § 285 and the court's inherent powers ("285 Motion"), and 28 U.S.C. § 1927 ("1927 Motion") (collectively the "Sanctions Motions"). The Rule 11 and 285 Motions were directed to Epic Tech and its counsel Baker, Donelson, Bearman, Caldwell & Berkowitz, PC ("Baker Donelson"). The 1927 Motion was

directed to Baker Donelson. The District Court retained jurisdiction post-judgment, *inter alia*, to decide the Sanctions Motions (APPX002523). On March 7, 2025, the District Court denied the Sanctions Motions in a single order. ("Order") (APPX000001-APPX000021). On April 7, 2025, Pen-Tech filed a Notice of Appeal of the Order. (APPX002526 - APPX002529).

This Court has jurisdiction pursuant to 28 U.S.C. § 1295 (a)(1).

## STATEMENT OF THE ISSUES

1.  Whether the District Court erred in denying the Sanctions Motions, when Epic Tech and Baker Donelson knew the legal standard for patent eligibility under § 101 changed shortly after the '317 Patent issued and the '317 Patent was ineligible under the changed standard, neither Epic Tech nor Baker Donelson performed a validity/eligibility examination of the '317 Patent under the changed standard before filing suit against Pen-Tech yet they maintained the Originating Case for four years.

2.  Whether the District Court erred in applying infringement law and facts to the Sanctions Motions which addressed validity issues, to support a finding that Epic Tech's pre-suit *infringement* analysis, not a v*alidity/eligibility* analysis, satisfied Epic Tech's Rule 11 obligation to verify its statement "the '317 Patent is valid...".

3.  Whether the District Court erred in applying infringement law and facts to the Sanctions Motions which addressed validity issues, when it found the Originating Case was neither frivolous nor exceptional.

4

## I. The Infringement Case

On June 5, 2020, Epic Tech filed a complaint against Pen-Tech alleging infringement of claims 1, 2, 4, 5, 7, 8, 9 and 10[1] of the '317 Patent (APPX000092 – APPX000099) ("Complaint"). Claim 1, reproduced at p. 9 below, is representative of the Asserted Claims. Baker Donelson signed the Complaint, verifying "[t]he '317 Patent is valid..." (APPX000100, APPX000103), even though Epic Tech and Baker Donelson knew or reasonably should have known that the claims were ineligible under the U.S. Supreme Court's *Alice Corp. Pty. Ltd. v. CLS Bank*, 573 U.S. 208 (2014) decision ("Alice").

On July 28, 2020, Baker Donelson signed the answer to Pen-Tech's counterclaim of invalidity, in which Epic Tech denied Pen-Tech's allegation that the claims of the '317 patent are invalid as indefinite for

---

[1] Epic Tech later added claim 18 in its infringement contentions, which it admitted merely "implements the method of Claim 1 in an integrated system networking all EGMs in a game room to a server running Community Prize." (APPX000689). Pen-Tech's Expert, Stacy Friedman confirmed in his Declaration in Support of Pen-Tech's Summary Judgment Motion of Invalidity Under 35 U.S.C. § 101, that claim 18 is substantively claim 1 (and/or 7-10) rewritten in a different form. (APPX000208 – APPX000210).

failure to satisfy one or more of the requirements for patentability set forth in the patent laws of the United States Code, including without limitation § 101. (APPX000128, APPX00135, APX00136).

On September 25, 2023, Pen-Tech moved for summary judgment under § 101. On September 23, 2024, the District Court granted Pen-Tech's summary judgment motion (APPX002522) holding the claims of the '317 ineligible under *Alice* (APPX002522) and dismissed the Complaint. (APPX002523).

## II. The Sanctions Motions

The Sanctions Motions are all predicated on the same set of facts. Epic Tech knew that the '317 Patent issued before *Alice*. Epic Tech received multiple notices from the USPTO (both before and after filing the Complaint) the claims were ineligible under § 101. Epic Tech was party to a case in the U.S. District Court for the Southern District of Texas in which that Court held the claims in a parent to the '317 Patent were ineligible under § 101. [2] (APPX000273 – APPX000274). Pen-Tech put Epic Tech and Baker Donelson on notice the claims were ineligible

---

[2] As discussed in more detail below, the Southern District of Texas held the claims of the '315 Patent, which were substantively the same as the claims of the '317 Patent, were ineligible under *Alice*.

under § 101 (APPX000146 – APPX000148). Epic Tech never performed a validity/eligibility investigation. (APPX001910). Before Epic Tech filed the Complaint, it had actual knowledge of facts showing the claims of the '317 Patent were ineligible under *Alice*. (APPX001910), Nevertheless, Epic Tech filed the Complaint and advanced the Originating Case for four years.

In the Order, the District Court stated: (1) Epic Tech's pre-suit *infringement* analysis, without a corresponding *validity/eligibility* analysis, was a sufficient "inquiry reasonable under the circumstances" to support the verified statement in the Complaint that "the '317 patent is valid…" (APPX000012), (2) Pen-Tech allegedly failed to identify the investigation Epic Tech and Baker Donelson were purportedly obligated to complete (APPX000012), (3) neither the USPTO's double patenting over the claims of the '317 Patent and § 101 rejections of several continuation applications to the '317 Patent, nor the Southern District of Texas' § 101 ineligibility ruling/reasoning under *Alice* of the parent to the '317 Patent provided notice to Epic Tech that the claims of the '317 Patent might be patent ineligible (APPX000013 – APPX000014) and (4)

7

the Originating Case was not frivolous or exceptional. (APPX000011 –

APPX000012, APPX000017, APPX000021).

### III. Epic Tech's Pre-Filing Knowledge

On October 1, 2013[3], the USPTO issued the '317 Patent

(APPX000067). On August 28, 2013, Epic Tech filed the first of five

continuation applications to the patent application that issued as the

'317 Patent.[4] Epic Tech abandoned all five continuation applications.

Each time a continuation application was abandoned, regardless of the

state of the then pending claims, the next continuation application was

filed with the original twenty claims from the first continuation

application. (APPX001905).

---

[3] Eight months before *Alice*.

[4] U.S. Patent Application No. 17/179,347 (the "'347 Application"), is a continuation of U.S. Patent Application No. 16/287,877 (the "'877 Application"), which is a continuation of U.S. Patent Application No. 15/292,360 (the "'360 Application"), which is a continuation of U.S. Patent Application No. 14/624,337 (the "'337 Application"), which is a continuation of U.S. Patent Application No. 14/012,113 (the "'113 Application"), which is a continuation of U.S. Patent Application No. 13/617,105 (the "'105 Application"), which issued as the '317 Patent (collectively, the "Family of Applications"). (APPX001613 – APPX001614)

Before Epic Tech filed the Complaint, the USPTO had already rejected three of the continuation applications (the '113 Application, the '337 Application and the '877 Application) over the claims of the '317 Patent and as ineligible subject matter under *Alice* (§ 101). (APPX000342 – APPX000346). For example, in a December 23, 2013 Office Action in the '113 Application, the USPTO stated:

> Claims 4-13 are rejected on the grounds of nonstatutory double patenting as being unpatentable over Claims 1 to 10 of U.S. Patent No. 8,545,317. **Although the claims at issue are not identical, they are not patentably distinct from each other…**" and

> "Claims 14-20 are rejected on the grounds of nonstatutory double patenting as being unpatentable over Claims 11 to 17 of U.S. Patent No. 8,545,317. **Although the claims at issue are not identical, they are not patentably distinct from each other…**" (Emphasis Added)
> (APPX000342 – APPX000346).

As support, the Office Action provided two exemplary claim charts correlating the then pending independent claim 4 with claim 1 of the '317 Patent (APPX000342 – APPX000346) (reproduced below) and pending independent claim 14 with claim 11 of the '317 Patent (not reproduced):

| Claim 4 of 14/012,113 | Claim 1 of 8,545,317 |
|---|---|
| A computer-implemented method comprising: | A computer-implemented method of allowing a user to play an electronic game on a terminal, said method comprising: |
| receiving, by one or more computer processors, a request from at least one player to play a game at a terminal; | receiving a request from a player to play a game at a terminal; |
| facilitating, by the one or more computer processors, play of the game at the terminal based at least in part on receiving the request; | at least partially in response to receiving the request, facilitating play of the game at the terminal; |
| establishing, by the one or more computer processors, a bonus time period for the at least one player based at least in part on receiving the request from the at least one player; | at least partially in response to receiving the request from the player, establishing a bonus time period for the player; |
| initiating, by the one or more computer processors, play of a second game at a particular point in time; | receiving an indication that play of a second game occurs at a particular point in time; |
| determining, by the one or more computer processors, if the bonus time period runs coincident with the particular point in time; | determining if the bonus time period runs coincident with the particular point in time; |
| determining, by the one or more computer processors, whether play of the second game results in a non-zero prize; and | determining, while the player is playing the first game, whether play of the second game results in a prize; and |
| in response to determining play of the second game results in a non-zero prize and the bonus time period runs coincident with the | if play of the second game results in a prize and the bonus time period runs coincident with the particular point in time, awarding |

10

| particular point in time, awarding, by the one or more computer processors, at least a portion of the non-zero prize to the at least one player, wherein once the second game is initiated to play, a server conducts all play of the second game without input from the at least one player until play of the second game is terminated. | at least a portion of the prize to the player, wherein once the second game is triggered to play, a server conducts all play of the second game without input from the player until play of the second game is terminated. |
|---|---|

On August 15, 2014, the USPTO mailed an Office Action (APPX000369 – APPX000370) reopening prosecution on the merits and rejecting claims 4 - 20 of the '113 Application (the claims that are patentably indistinct from claims 1-17 of the '317 Patent), for claiming ineligible subject matter under Alice (35 U.S.C. §101). (APPX000369 – APPX000370) According to the Office Action:

> Prosecution on the merits of this application is reopened for Claims 4 to 20. Claims 4 to 20 are considered unpatentable in view of the Supreme Court Decision in Alice Corporation Pty. Ltd. v. CLS Bank International, et al…This decision has caused all of the pending claims to be rejected with new grounds of rejection under 35 U.S.C. §101…

> …the claims as a whole, considering all claim elements both individually and in combination, **do not amount to significantly more that (Sic.) an abstract idea**. The claims are directed to the abstract idea of (i) a fundamental economic practice of providing awards in games and (ii) an idea of itself for display. The additional elements or combination of elements in the claims other than the

abstract idea per se amount to no more than: (i) mere instructions to implement the idea on a computer, and/or (ii) recitation of a generic computer structure serves to perform generic computer functions…**Viewed as a whole these additional claim elements do not provide meaningful limitations to transform the abstract idea into a patent eligible application of the abstract idea**…(Emphasis added). (APPX000369 – APPX000370).

Epic Tech abandoned all three applications without overcoming the § 101 rejections.[5] (APPX000309, APPX000311, APPX0002136). Further, two years before filing the Complaint, Baker Donelson (specifically, a lawyer on the Epic Tech litigation team) assumed responsibility for the prosecution of the continuation application pending at that time (the '360 Application) (APPX002018), and for subsequent continuation applications filed on Epic Tech's behalf.

## IV. Epic Tech's Post-Filing Knowledge

On the same date the '317 Patent issued, the USPTO issued U.S. Patent No. 8,545,315 ("'315 Patent") (APPX000067, APPX000284). The '317 Patent claimed priority as a continuation-in-part application to the patent application that issued as the '315 Patent (APPX000067).

---

[5] Epic Tech filed, without comment, a terminal disclaimer to overcome the double patenting rejection.

12

Epic Tech filed the complaint on June 5, 2020. (APPX000086). On April 13, 2021, the U.S. District Court for the Southern District of Texas issued a Memorandum and Order, *inter alia*, holding the asserted claims of the '315 Patent ineligible under § 101.[6] *Epic Tech, LLC v. Fusion Skill, Inc.*, 534 F. Supp. 3d 741, 746 (S.D. Tex. 2021) ("Fusion Skill"). The invalid '315 claims are substantively the same as claims 1 and 18 of the '317 Patent. (APPX000208 – APPX000210).

On April 30, 2020, the USPTO rejected the then pending claims in the '877 Application under § 101 for being directed to ineligible subject matter. (APPX002226 – APX002235). On October 25, 2020, Epic Tech/Baker Donelson cancelled all the claims and remarked:

> **The examiner found that claims 1 – 20 related to an abstract idea**…under 2019 PEG. **The applicant presents new claims 21 – 44** directed to a novel entertainment playing system or electronic terminals networked for electronic communication... (APPX002205) (Emphasis added).

---

[6] The Texas Court vacated the summary judgment of invalidity based on a Joint Motion filed by the parties as part of a settlement agreement, however, the Court noted in the Order that: "…even following vacatur, 'whatever instructive or persuasive guidance [the Court's opinion] may provide continues to exist.'… '[t]he analysis and logic of the opinion may be used for whatever authority this court or another court may deem appropriate." (APPX000273, APPX000276)

Rejected claims 1 – 20 were patentably indistinct from the Asserted Claims. Epic Tech's Baker Donelson patent prosecution counsel canceled claims 1 - 20 without providing any argument against the § 101 rejections. Epic Tech/Baker Donelson allowed the '877 Application to abandon[7] on July 1, 2021, and the USPTO issued a Notice of Abandonment which states on its face that "No reply has been received." (APPX002135 – APPX002136).

On September 1, 2021, Pen-Tech served and filed its Invalidity Contentions (APPX000140 – APPX000151), in which it showed why the Asserted Claims were ineligible under the *Alice* test for § 101. (APPX000141, APPX000146 - APPX000148).

On January 12, 2022, Pen-Tech served its First Set of Interrogatories (1-11) on Epic Tech. (APPX000507 – APPX000514). Interrogatories No. 6 requested in relevant part:

> Identify all factual and legal bases to support - on a claim-by-claim and limitation-by-limitation basis - Epic Tech's contention, if any, that the asserted claims are not invalid under 35 U.S.C. §§101… (APPX000510 – APPX000511)

---

[7] After receiving a restriction requirement for new claims 21-44.

Epic Tech's response, which was signed by Baker Donelson

(APPX000515 – APPX000526), stated:

> Epic Tech objects to Interrogatory No. 6 as its an impermissible basis to demand a response to Pen-Tech's invalidity contentions, a response which is not required by the Local Patent Rules...

Pen-Tech, on February 2, 2023, served its Second Set of

Interrogatories on Epic Tech (APPX000312 – APPX000317).

Interrogatory Nos. 16 and 17 respectively requested:

> Identify all factual and legal bases to support - on a claim-by-claim and limitation-by-limitation basis - Epic Tech's contention, if any, that patentable distinctions exist between claims 4-13 of the '113 Application and claims 1-10 of the '317 Patent respectively. (APPX000315).

> Identify all factual and legal bases to support - on a claim-by-claim and limitation-by-limitation basis - Epic Tech's contention, if any, that patentable distinctions exist between claims 14-20 of the '113 Application and claims 11-17 of the '317 Patent respectively. (APPX000315).

On March 23, 2023, Epic Tech responded to Interrogatories 16 and 17

with various objections and a statement that "Epic Tech will respond to

Interrogatory No. [16/]17, if at all, via timely expert discovery," but with

no substantive response. (APPX000326 – APPX000332). Regardless

that Epic Tech never substantively responded, these interrogatories

15

placed Epic Tech on notice of the § 101 eligibility issues with the Asserted Claims.

On May 17, 2024, Pen-Tech reluctantly notified Epic Tech and Baker Donelson that, because Epic Tech and Baker Donelson knew or reasonably should have known that the claims of the '317 Patent were directed to ineligible subject matter under *Alice*, Pen-Tech would file, *inter alia*, the Rule 11 Motion if Epic Tech did not dismiss the Originating Case. (APPX001930 – APPX001952). Epic Tech did not dismiss the Originating Case.

## SUMMARY OF THE ARGUMENT

The District Court erred in denying Pen-Tech's Sanctions Motions. Epic Tech and Baker Donelson knew or reasonably should have known that the '317 Patent issued before *Alice* and thus it would be unreasonable to rely on the rebuttable presumption of validity, which supposes the USPTO has already "properly" examined the validity issue in question (*i.e.*, § 101). *Integrated Advert. Labs, LLC v. Revcontent, LLC*, 644 F. Supp. 3d 1031, 1037 (M.D. Fla. 2022) (Citing *Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1319 (Fed. Cir. 2019)). While the USPTO did not examine the claims of the '317 Patent under *Alice*, it did examine

16

patentably indistinct claims from those of the '317 Patent in three of the continuation applications and rejected them under double patenting against the claims of the '317 Patent and under § 101, before Epic Tech filed the Complaint. (APPX000342 - APPX000346, APPX000369 - APPX000370, APPX000390 - APPX000394, APPX000398 - APPX000401, APPX002226 - APPX002235).

Armed with that knowledge, Epic Tech was required to conduct a pre-suit *validity/eligibility* analysis of the claims of the '317 Patent. (APPX000010 – APPX000011), See also, *Walther v. McIntosh*, 572 F. App'x 881, 883 (11th Cir. 2014). Epic Tech did no such analysis, but if they had, they would have confirmed the ineligibility conclusion reached by the USPTO and eventually the Southern District of Texas, Pen-Tech and the District Court.

The District Court correctly concluded that the claims of the '317 Patent were ineligible under *Alice*, but it based its erroneous sanctions determinations on irrelevant infringement facts, incorrect law and inconsistent statements made within the Order.

When Epic Tech filed the Complaint, both Epic Tech and Baker Donelson knew or reasonably should have known the claims of the '317

17

Patent were directed to ineligible subject matter under the *Alice* test for § 101.[8]  On three separate occasions, the USPTO rejected patentably indistinct claims from those of the '317 Patent under § 101. (APPX000342 - APPX000346, APPX000369 - APPX000370, APPX000390 - APPX000394, APPX000398 - APPX000401, APPX002226 - APPX002235).  Epic Tech ignored these notifications for the sole purpose of harassing its competitor whom it believed spurned it in past business dealings.[9]

Epic Tech verified to the District Court that "to the best of their knowledge, information, and belief, *formed after an inquiry reasonable under the circumstances*" the '317 Patent was valid. Fed. R. Civ. P. 11. (emphasis added).  Contrary to this verification, neither Epic Tech nor Baker Donelson, both of whom were notified the claims of the '317 Patent were ineligible, had performed an independent inquiry into the

---

[8] Based, at least in part on the multitude of patent cases involving 35 U.S.C. § 101 decided after *Alice*.  The law firm Gibson Dunn in 2019 even created a chart summarizing the results of all Post-Alice cases to that point See https://www.gibsondunn.com/wp-content/uploads/2019/03/Overview-of-Section-101-Patent-Cases-Decided-After-Alice-v-CLS-as-of-03-01-19.pdf.

[9] See Epic Tech's Statement of Undisputed material Facts in Support of Its Motion for Summary Judgment (APPX000529 – APPX000532).

validity/eligibility of the claims under the *Alice* standard for § 101. (APPX001910). Pen-Tech informed the District Court of *Alice*, identified the plethora of notices that Epic Tech and Baker Donelson received and presented undisputed evidence why under these circumstances a reasonable inquiry prior to filing the complaint required a validity/eligibility inquiry under *Alice*. (APPX000010 – APPX000011).

Because it ignored these uncontroverted facts, the District Court erred in finding that, (1) the Originating Case was neither frivolous nor exceptional, (2) Epic Tech and Baker Donelson's *infringement* inquiry satisfied their obligation to verify to the District Court that they performed a reasonable investigation into the validity/eligibility of the claims of the '317 Patent and the result of that inquiry was they were valid/eligible, (3) Pen-Tech did not inform the District Court of the specific test that Epic Tech should have performed and (5) the USPTO double patenting / § 101 rejections did not place Epic Tech on notice that the Asserted Claims failed the *Alice* test for eligibility.

After filing the Complaint, both Epic Tech and Baker Donelson received notice from multiple entities (*i.e.,* the Southern District of Texas, the USPTO and Pen-Tech) that the claims of the '317 Patent

were invalid/ineligible under § 101. Epic Tech ignored each of those warnings and maintained the frivolous Originating Case against Pen-Tech. The District Court erred in finding the Originating Case was not exceptional, and that Epic Tech had no notice that the claims of the '317 Patent were ineligible under *Alice*.

The District Court's denial of Pen-Tech's Sanctions Motions should be reversed. Epic Tech and Baker Donelson (1) knew or reasonably should have known that the '317 Patent issued before *Alice*, (2) had unequivocal notice the claims of the '317 Patent were invalid/ineligible under *Alice*, (3) did no independent validity/eligibility analysis under *Alice* before certifying to the District Court the '317 Patent was valid, and (4) knowingly filed the frivolous Originating Case and advanced it for four years.

## ARGUMENT

### I. Standard of Review

This Court reviews a district court's Rule 11 sanctions decision for an abuse of discretion and applies the law of the regional circuit (here the Eleventh Circuit). *Source Vagabond Sys. v. Hydrapak, Inc.*, 753 F.3d 1291, 1298 (Fed. Cir. 2014). This Court also applies the law of the

20

regional circuit when reviewing a district court's § 1927 decision. *Baldwin Hardware Corp. v. Franksu Enter. Corp.*, 78 F.3d 550, 560-61 (Fed. Cir. 1996). The Eleventh Circuit reviews § 1927 decisions for an abuse of discretion. *Id.* at 561. "An abuse of discretion can occur where the district court applies the wrong law, follows the wrong procedure, bases its decision on clearly erroneous facts, or commits a clear error in judgment." *United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005).

Section 285 of the Patent Act provides for an award of attorney fees in "exceptional cases." 35 U.S.C. § 285. This Court reviews "*de novo*, whether the district court applied the correct legal standards under § 285" and reviews "the district court's factual findings underlying an exceptional case determination for clear error." *Gaymar Indus. v. Cincinnati Sub-Zero Prods.*, 790 F.3d 1369, 1372 (Fed. Cir. 2015). This Court should reverse the District Court's Order because the "decision is based on clearly erroneous findings of fact, is based on erroneous interpretations of the law, or is clearly unreasonable, arbitrary or fanciful." *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1460 (Fed. Cir. 1998) (*en banc*).

## II. The District Court Erred by Relying on Epic Tech's Pre-Suit Rule 11 Infringement Inquiry

The District Court abused its discretion by "appl[ying] the wrong law, bas[ing] its decision on clearly erroneous facts, and commit[ing] a clear error in judgment." *United States v Brown*, 415 F.3d at 1266. The District Court based its decision to deny Pen-Tech's Rule 11 Motion on irrelevant facts and law related to *infringement* and the requirements of a reasonable pre-suit *infringement* inquiry (APPX000010, APPX000012, APPX000014, APPX000018). However, Pen-Tech's Rule 11 Motion presented validity issues, not infringement. (APPX000010) ("Pen-Tech moves for Rule 11 sanctions against Epic Tech and Baker Donelson for filing and maintaining its 'frivolous claims' against Pen-Tech because Epic Tech and Baker Donelson knew or had reason to know before, and after, filing the Complaint that the Asserted Claims of the '317 Patent were invalid under the modern eligibility standard for 35 U.S.C. §101 established by the Supreme Court in *Alice*.")

Pen-Tech argued (1) Epic Tech knew or reasonably should have known that the '317 Patent issued before *Alice*, (2) Epic Tech knew or reasonably should have known that the '317 Patent was *invalid/ineligible* under *Alice* / § 101, (3) Epic Tech was notified multiple

22

times by the USPTO that the claims of the '317 Patent were

*invalid/ineligible* under the *Alice* test for § 101, and (4) despite the

notices and knowledge, Epic Tech did no independent pre-suit

*validity/eligibility* inquiry. (APPX000010, APPX000011). Thus, when

Epic Tech "certifie[d] that to the best of [their] knowledge, information,

and belief, formed after an inquiry reasonable under the circumstances"

the complaint and the answer to counterclaims "(1) [were] not being

presented for any improper purpose, such as to harass, cause

unnecessary delay, or needlessly increase the cost of litigation; (2) the

claims, defenses, and other legal contentions [were] warranted by

existing law or by a nonfrivolous argument for extending, modifying, or

reversing existing law or for establishing new law; (3) the factual

contentions have evidentiary support or, if specifically so identified, will

likely have evidentiary support after a reasonable opportunity for

further investigation or discovery; and (4) the denials of factual

contentions [were] warranted on the evidence or, if specifically so

identified, [were] reasonably based on belief or a lack of information"

(Rule 11(b)) they violated their Rule 11 obligations.

The District Court erred by failing to "evaluate whether [Epic Tech's statement that the '317 Patent is valid] could reasonably have been believed by the signer [of the complaint and the answer to counterclaims] at the time of signing." *Aetna Ins. Co. v. Meeker*, 953 F.2d 1328, 1331 (11th Cir. 1992) (citing *Thread Props. v. Title Ins. Co. of Minn.*, 875 F.2d 831, 835 (11th Cir. 1989); Advisory Committee Note to Fed. R. Civ. P. 11). Instead, the District Court evaluated the signer's alleged reasonable belief in their infringement assertion (based on an unrelated pre-suit *infringement* analysis, claim chart and infringement notice letter) and erroneously substituted the irrelevant belief in the infringement assertion for a reasonable validity belief. (APPX000010, APPX000012). The two are not interchangeable. *Commil USA, LLC v. Cisco Sys.*, 575 U.S. 632, 643 (2015). The District Court's abuse of discretion is further highlighted by the fact that it acknowledged then ignored that Pen-Tech's allegations of Epic Tech's knowledge of the invalidity of the '317 Patent "ha[d] considerable credence." (APPX000011).

The District Court abused its discretion and committed clear error by relying on *infringement* issues to deny Pen-Tech's validity-centric Rule

11 Motion. Because the District Court erroneously applied the wrong facts to the incorrect legal standard this Court should reverse. See *United States v Brown*, 415 F.3d at 1266. The result of this clear error permeates throughout the remaining issues and motions.

### III. The District Court Applied the Incorrect Law When Analyzing Epic Tech's Knowledge Under Rule 11

"The purpose of Rule 11 sanctions is to reduce frivolous claims, defenses, or motions, and to deter costly meritless maneuvers." *Kaplan v. Daimler Chrysler, A.G.*, 331 F.3d 1251, 1255 (11th Cir. 2003) (citation and quotation omitted). Because Rule 11 incorporates an objective standard, the court must determine "whether a reasonable [litigant] in like circumstances could believe his actions were factually and legally justified." *Id.* (citation omitted) (addressing Rule 11 sanctions in the context of an offending attorney using a reasonable attorney standard). *McDonald v. Emory Healthcare Eye Ctr.*, 391 Fed. Appx. 851, 852-853 (11th Cir. 2010)

The District Court abused its discretion by "appl[ying] the wrong law…" when it determined that the USPTO's multiple rejections of claims that were determined to be patentably indistinct from the claims of the '317 Patent (double patenting) and ineligible under *Alice* failed to

inform Epic Tech that the Asserted Claims were invalid. (APPX000014, APPX000018).

Notice is the purpose of a USPTO office action. 35 U.S.C. § 132(a).[10] The District Court's Rule 11 ruling to the contrary constitutes an abuse of discretion that should be reversed.

The District Court erroneously held that multiple USPTO double patenting and § 101 rejections did not place Epic Tech on notice that the '317 Patent was invalid. (APPX000014, APPX000018).  It "decline[d] to take such a leap, particularly when no court has found that the prosecution history of a later patent can reach back and limit a claim using the same element in an earlier related patent." (APPX000014, APPX000018).  While the Order did not acknowledge the caselaw citation for this statement, it is taken from *Jeneric/Pentron, Inc. v.*

---

[10] "Whenever, on examination, any claim for a patent is rejected, or any objection or requirement made, the Director shall notify the applicant thereof, stating the reasons for such rejection, or objection or requirement, together with such information and references as may be useful in judging of the propriety of continuing the prosecution of his application; and if after receiving such notice, the applicant persists in his claim for a patent, with or without amendment, the application shall be reexamined. No amendment shall introduce new matter into the disclosure of the invention."

*Dillon Co.*, 171 F. Supp. 2d 49, 77 (D. Conn. 2001)[11]  Notably, the statement relates to infringement, not invalidity, and has no relevance to Pen-Tech's Rule 11 Motion.

The relevant law relates to notice.  The purpose of an office action is to notify an applicant of the issues related to the claims.  For example, in *In re Zimmerman*, No. 2023-1542, 2024 U.S. App. LEXIS 3034, at *9 (Fed. Cir. Feb. 9, 2024) this Court held:

> 'Section 132 is violated when a rejection is so uninformative that it prevents the applicant from recognizing and seeking to counter the grounds for rejection.' *Chester v. Miller*, 906 F.2d 1574, 1578 (Fed. Cir. 1990); see also *In re Jung*, 637 F.3d 1356, 1362 (Fed. Cir. 2011) (describing examiner's obligation to 'explain[] the shortcomings it perceives so that the **applicant is properly notified** and able to respond') (internal quotation marks and brackets omitted). The office action…met this statutory requirement **by informing him his**

---

[11] "Defendants, however, cite to no authority, and the Court finds none, for the proposition that just as the prosecution history of an earlier patent may limit a claim using the same term in a later related patent, so may the prosecution history of a later patent reach back and limit a claim using the same element in an earlier related patent. The Court finds this proposition implausible, especially where a defendant is attempting to use this principal as a vehicle to apply prosecution history estoppel to an element that was an original part of a prior patent and that was never amended or argued. Accordingly, the Court finds that prosecution history estoppel does not apply to the lithium oxide component in the '791 Patent, and, therefore, Plaintiff is not precluded from using the doctrine of equivalents to establish infringement."

> claims were ineligible under § 101 because they were directed to an abstract idea…'") (emphasis added).

In the Originating Case, before filing the Complaint, Epic Tech was provided notice in the form of multiple office actions, at least one of which (the '113 Application) included claim charts (one reproduced above) correlating the rejected claims to the claims of the '317 Patent and another Office Action in the same application (also reproduced above) explaining that prosecution on the merits was being reopened to reject the claims as ineligible as a result of *Alice*.

The District Court abused its discretion by "appl[ying] the wrong law, bas[ing] its decision on clearly erroneous facts, and commit[ing] a clear error in judgment" and should be reversed. See *United States v Brown*, 415 F.3d at 1266. The result of this clear error permeates throughout each of the issues and motions.

## IV. The District Court Erroneously Relied on Irrelevant Facts and Law to Determine the Originating Case was not Frivolous

According to the Eleventh Circuit, a claim is frivolous "when it appears the factual allegations are clearly baseless or the legal theories are indisputably meritless…[in other words] without arguable merit either in law or fact." *Minnis v. Ga. DOL*, No. 5:24-cv-46, 2025 U.S.

Dist. LEXIS 79345, at *5 (S.D. Ga. Mar. 24, 2025) citing *Neitzke v. Williams*, 490 U.S. 319, 327, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989) (citations omitted); See also *Aim Immunotech, Inc. v. Tudor*, No. 23-13576, 2025 U.S. App. LEXIS 7566, at *7 (11th Cir. Apr. 1, 2025)("A factual claim is frivolous when it has no reasonable factual basis, whereas a 'legal claim is frivolous when it has no reasonable chance of succeeding.'" (citations omitted)).  According to the Federal Court of Claims, "[o]ther circuits have succinctly defined frivolous claims…as those which involve legal points not arguable on their merits, or those whose disposition is obvious." *Deweese v. United States*, 171 Fed. Cl. 187, 189 (2024).  The Originating Case is a textbook example of a frivolous case.[12]  The District Court ignored the relevant and credible invalidity facts (instead relying on irrelevant infringement facts) to determine the Originating Case was not frivolous.  The District Court also applied irrelevant infringement law to the issue of notice. The District Court's ruling is an abuse of discretion and should be reversed.

---

[12] Confirmed by various post-*Alice* cases identified above in the Gibson Dunn chart.

The Order (APPX000011) references and confirms the "considerable credence" of Pen-Tech's allegations:

> (1) Epic Tech's five failed attempts at securing additional protection for the claims of the '317 Patent should have been sufficient to place Epic Tech and Baker Donelson on notice that a pre-suit analysis was not only reasonable under the circumstances, but required, (2) the CEO of Epic Tech, Erik Nordin, was aware that the claims of the '317 Patent were 'not directed to patentable subject matter,' and therefore knew the claims were invalid, and (3) Baker Donelson, as the firm on record on at least three separate occasions where the claims were rejected under 35 U.S.C. §101, was on notice that a pre-suit analysis under 35 U.S.C. § 101 was required under the circumstances. (citation omitted).

However, the District Court ignored the credible allegations, and erroneously determined it "was not prepared to color Epic Tech's conduct – and by extension, Baker Donelson's – as 'frivolous'" because: (1) Epic Tech performed a pre-suit infringement investigation (including creating a claim chart and a cease-and-desist letter), (2) "Pen-Tech, crucially, does not point to any case law outlining the precise investigation Epic Tech and its counsel were purportedly obligated to complete" (even though Pen-Tech specifically identified, and the District Court confirmed the identification in other sections of the Order, that the *Alice* test was the required test), and (3) the District Court "decline[d] to take such a leap, particularly when no court has found

that the prosecution history of a later patent can reach back and limit a claim using the same element in an earlier related patent" (, APPX000011 - APPX000012, APPX000014)  No "leap" was required because Pen-Tech did not ask the District Court to rule on prosecution history estoppel or how it applies to the doctrine of equivalents.  Rather, Pen-Tech asked the District Court to rule the USPTO Office Actions put Epic Tech and Baker Donelson on notice that the claims of the '317 Patent were invalid, and they needed to perform an independent validity/eligibility investigation if they disagreed.  The District Court applied clearly erroneous infringement facts, and erroneously applied infringement law (*i.e.*, prosecution history estoppel as it applies to the doctrine of equivalents) to the issue of invalidity.  Infringement and invalidity are separate matters under the patent law." *Commil USA, LLC v. Cisco Sys.*, 575 U.S. 632, 643 (2015).

The District Court "applied the wrong law, based its decision on clearly erroneous facts, and committed a clear error in judgment" and as such abused its discretion. See *United States v Brown*, 415 F.3d at 1266.  The Originating Case was frivolous.  This abuse of discretion also

led the District Court to erroneously find the Originating Case was not exceptional.

## V. The District Court Erroneously Relied on Irrelevant Facts and Incorrect Law to Determine the Originating Case was not Exceptional

The District Court's incorrect determinations that Epic Tech's infringement investigation was sufficient to support the statement "the '317 Patent is valid", the USPTO Office Actions failed to notify Epic Tech and Baker Donelson the Asserted Claims were ineligible under *Alice*, and the Originating Case was thus not frivolous led to the next erroneous finding – that the Originating Case was not exceptional. The District Court abused its discretion by basing its §§ 1927 and 285 rulings "on a clearly erroneous assessment of the evidence" *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.,* 572 U.S. 559, 563 n.2. (2014) (quotation removed), "clearly erroneous findings of fact…erroneous interpretations of the law…" and "arbitrary" application of the same. *Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1460 (Fed. Cir. 1998) (*en banc*). While the District Court stated the correct "totality of the circumstances" standard for what makes a case "stand [] out" *Octane Fitness, LLC v. ICON Health & Fitness, Inc.,* 134 S. Ct. 1749, 1751

(2014) it based its decision on the wrong totality of circumstances (*i.e.,* those related to infringement rather than those related to invalidity and notice).

The District Court concluded the Originating Case was not frivolous because Epic Tech performed an infringement investigation (not a validity investigation) and "the USPTO's prior opinions rejecting related claims of the '317 Patent may provide persuasive value in the prosecution history of a later patent, but the Court is not prepared to hold that it is sufficient to demonstrate that Epic Tech and Baker Donelson pursued the case without a reasonable belief that it had merit." (APPX000012, APPX000013, APPX000018).  In addition to addressing the incorrect evidence (*i.e.,* infringement), the District Court's reasoning regarding the findings of the USPTO is arbitrary, a clear abuse of discretion and should be reversed.

Pen-Tech never asserted the USPTO's § 101 rejections of patentably indistinct claims from the Asserted Claims modified the scope of the Asserted Claims.  Instead, Pen-Tech demonstrated the rejections of patentably indistinct claims by "reasonable" patent examiners (including, *inter alia*, claim charts correlating the then pending claims

with the claims of the '317 Patent and a detailed § 101 analysis) put

Epic Tech on notice (35 U.S.C. § 132(a)) that the claims of the '317

Patent were ineligible under *Alice*.  Epic Tech's deliberate indifference

to this information, as evidenced by its failure to conduct an

independent validity analysis under *Alice*, was not "acceptable

according to an objective standard.  *Amlong & Amlong, P.A. v. Denny's

Inc.*, 500 F.3d 1230, 1240 (11th Cir. 2007).  The conclusions reached by

reasonable patent examiners, on at least three separate occasions,

prove an objectively reasonable person would have investigated the

validity of the Asserted Claims and found them to be ineligible under §

101.

Additionally, Epic Tech received at least three more notifications

after filing the Complaint that proved any reasonable person would

have known the claims of the '317 Patent were ineligible under *Alice.*

The Southern District of Texas's holding in Fusion Skill provided notice

of § 101 ineligibility, the additional § 101 rejections from the USPTO in

the continuation applications provided notice of § 101 ineligibility, and

Pen-Tech's Invalidity Contentions and Interrogatories provided notice

of § 101 ineligibility.  Disregarding the multitude of notices Epic Tech

pressed the frivolous Originating Case for four years. The District Court abused its discretion when it held that the Originating Case was not exceptional. *Forest Labs., Inc. v. Abbott Labs.*, 339 F.3d 1324, 1329 (Fed. Cir. 2003) ("We have repeatedly identified as 'exceptional' those cases involving…'a frivolous suit…'" (citations omitted). This Court should reverse the District Court and find the Originating Case exceptional under §§ 1927 and 285.

## VI. The District Court's Order was Arbitrary and Internally Inconsistent

The District Court's Order was also internally inconsistent and arbitrary. When discussing of Rule 11, the Order states:

> Pen-Tech moves for Rule 11 sanctions against Epic Tech and Baker Donelson for filing and maintaining its "frivolous claims" against Pen-Tech because Epic Tech and Baker Donelson knew or had reason to know before, and after, filing the Complaint that the Asserted Claims of the '317 Patent were invalid under the modern eligibility standard for 35 U.S.C. §101 established by the Supreme Court in *Alice*. Specifically, in the wake of the Supreme Court's decision in *Alice*, Pen-Tech argues that Epic Tech and Baker Donelson should have conducted a pre-suit validity analysis of the Asserted Claims. (APPX000010).

However, as part of the basis for denying Pen-Tech's Rule 11 Motion the Order arbitrarily and erroneously states "Pen-Tech, crucially, does not

point to any case law outlining the precise investigation Epic Tech and its counsel were purportedly obligated to complete." (APPX000012).

The Order further states:

> In its Motion, Pen-Tech asserts that: (1) Epic Tech's five failed attempts at securing additional protection for the claims of the '317 Patent should have been sufficient to place Epic Tech and Baker Donelson on notice that a pre-suit analysis was not only reasonable under the circumstances, but required, (2) the CEO of Epic Tech, Erik Nordin, was aware that the claims of the '317 Patent were "not directed to patentable subject matter," and therefore knew the claims were invalid, (3) Baker Donelson, as the firm on record on at least three separate occasions where the claims were rejected under 35 U.S.C. §101, was on notice that a pre-suit analysis under 35 U.S.C. § 101 was required under the circumstances. (citation omitted).

> In light of this Court's September 23, 2024, Order granting Pen-Tech's Motion for Summary Judgment, Pen-Tech's allegations have considerable credence... (, APPX000011).

The Order, however, relied on a conflicting statement that "[t]hroughout the § 285 Motion, Pen-Tech provides only vague assertions regarding Epic Tech and Baker Donelson's prior knowledge of the patent ineligibility of the '317 Patent, but Pen-Tech does not set forth the necessary specifics of their "bad faith" sufficient to warrant an exceptionality determination." (APPX000017). Bad faith and exceptionality are not both required under § 285; either one may

36

warrant a fee award. *Octane Fitness LLC v. ICON Health and Fitness, Inc.*, 572 U.S. 545, 555 (2104). ("But a case presenting either subjective bad faith or exceptionally meritless claims may sufficiently set itself apart from mine-run cases to warrant a fee award."). Pen-Tech provided the same considerably credible evidence showing Epic Tech's and Baker Donelson's knowledge of facts demonstrating the Asserted Claims were invalid under § 101 in all three motions. The District Court abused its discretion by arbitrarily discounting this evidence and taking conflicting positions. The weakness of a § 101 position justifies an exceptional case finding. *Inventor Holdings, LLC v. Bed Bath & Beyond, Inc.*, 876 F.3d 1372, 1377-78 (Fed. Cir. 2017) ("We conclude that the district court acted within the scope of its discretion in finding this case to be exceptional based on the weakness of IH's § 101 arguments and the need to deter similarly weak arguments in the future.") The District Court's ruling is an abuse of discretion and should be reversed.

Finally, in its discussion of the Rule 11 Motion, the District Court referenced Pen-Tech's allegation that "in the wake of the Supreme Court's decision in *Alice*…Epic Tech and Baker Donelson should have

37

conducted a pre-suit validity analysis of the Asserted Claims."

(APPX000010). However, in its reasoning for denying Pen-Tech's Rule

11 Motion the Order only analyzed Plaintiffs' infringement analysis:

> Specifically, Epic Tech provided witness testimony from
> Jason Queen, Epic Tech's 30(b)(6) Representative and
> Director of Information Technology, who testified about his
> role in Epic Tech's investigation. [ ] Additionally, Epic Tech
> contends that Baker Donelson, too, met its pre-suit
> investigation obligations by creating a claim chart and a
> cease and desist letter using images from Epic Tech's pre-
> suit investigation. (APPX000012).

The District Court's arbitrary evaluation of Epic Tech's and Baker

Donelson' infringement investigation to support their verified statement

that "the '317 Patent is valid" is a clear abuse of discretion and should

be reversed.

## VII. Conclusion and Relief Sought

The District Court erred in ruling that Epic Tech and Baker

Donelson had no knowledge that the claims of the '317 Patent were

ineligible under the *Alice* standard for 35 U.S.C. § 101. The District

Court also erred in ruling that Epic Tech's pre-suit infringement

investigation was sufficient to support its verified statement that the

'317 Patent is valid, and Pen-Tech failed to identify the invalidity

investigation that Epic Tech were required to perform. As a result of

the preceding errors, the District Court erred in ruling that the Originating Case was not frivolous and that it was not exceptional.

Pen-Tech respectfully requests this Court reverse the District Court's findings regarding the Rule 11, 35 U.S.C. § 285 and 28 U.S.C. § 1927 Motions. Pen-Tech further requests remand for further proceedings to determine the amount of fees to award Pen-Tech, including the fees incurred in this appeal.

June 24, 2025

/s/ Richard M. Lehrer
Richard M. Lehrer (RL2498)
FISHERBROYLES, LLP
361 Pharr Rd. NE Unit 113
Atlanta, GA 30305
(845) 519-9525
Richard.Lehrer@FisherBroyles.com

Alastair J. Warr
FISHERBROYLES, LLP
203 N. LaSalle Street, #2100
Chicago, IL 60601
(317) 407-5260
Alastair.Warr@FisherBroyles.com

*Counsel for Appellant*

# ADDENDUM

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

EPIC TECH, LLC,

     Plaintiff,

v.

PEN-TECH ASSOCIATES, INC.,

     Defendant.

Civil Action No.
1:20-cv-02428-VMC

## ORDER

This matter is before the Court on Defendant Pen-Tech Associates, Inc.'s ("Defendant" or "Pen-Tech") Rule 11 Motion for Sanctions (Doc. 120-1) and Motion for Fees and Costs Under 35 U.S.C. § 285, 28 U.S.C. § 1927, and This Court's Inherent Power (Doc. 123-1), as well as Plaintiff Epic Tech, LLC's ("Plaintiff" or "Epic Tech") Motion to Exclude the Expert Witness Testimony of Richard M. Lehrer (Doc. 131). Also before the Court is Pen-Tech's Motion for Leave to File Matters Under Seal (Doc. 121). For the reasons set forth below, Pen-Tech's motions for sanctions (Docs. 120-1, 123-1) and Motion for Leave to File Matters Under Seal (Doc. 121), as well as Epic Tech's Motion to Exclude (Doc. 131) are denied.

## I.    Background

This matter comes before the Court in an interesting procedural posture. On September 23, 2024, this Court ruled on the Parties' cross motions for summary

judgment. (Doc. 143). There, the Court held that the Claims 1, 2, 4, 5, 7–10, and 18 (the "Asserted Claims") of U.S. Patent No. 8,545,317 ("the '317 Patent") were invalid under 18 U.S.C. § 101 for claiming an ineligible subject matter and denied Epic Tech's Motion for Summary Judgment. In so holding, the Court relied on the Supreme Court's decision in *Alice Corp. Pty. Ltd. v. CLS Bank*, 573 U.S. 208 (2014) which articulated a new standard for examining patent eligibility requiring the Court to conduct a two-step inquiry. *Alice*, 573 U.S. at 216. Step one requires that the Court ask "what the patent asserts to be the focus on the claimed advance over the prior art." *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1292 (Fed. Cir. 2020) (punctuation omitted) (quoting *Solutran, Inc. v. Elavon, Inc.*, 931 F.3d 1161, 1168 (Fed. Cir. 2019)). Under the second step, the Court "must examine the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 221 (internal quotation omitted). The Court determined that the '317 Patent failed step one of *Alice* because it is directed to processes rather than improvements to computer capabilities. (Doc. 143 at 10). The Court next considered step two of the *Alice* test and found that Epic Tech failed to demonstrate that the '317 Patent claimed any legitimately inventive concepts. (*Id.* at 16). The Court, having denied Epic Tech's motion, entered judgment against Epic Tech, declared that the

2

Asserted Claims of the '317 Patent were invalid under 18 U.S.C. § 101, and granted Pen-Tech the costs of this action. (Doc. 144).

The Motions currently before the Court were filed in advance of this Court's September 23, 2024 Order. Pen-Tech filed its Rule 11 Motion for Sanctions Against Epic Tech and Baker, Donelson, Bearman, Caldwell & Berkowitz ("Baker Donelson") (Doc. 120-1) on July 18, 2024, requesting that this Court hold Epic Tech and Baker Donelson jointly and severally liable for Pen-Tech's attorneys' fees and other costs and expenses associated with its defense of the present action. (Doc. 120-1 at 25). Attached to Pen-Tech's Rule 11 Motion is a Declaration by Richard M. Lehrer. (Doc. 120-3). The Declaration, which includes the opinions of Mr. Lehrer, is the subject of Epic Tech's Motion to Exclude, whereby Epic Tech contends that Pen-Tech, and by extension Mr. Lehrer, offered untimely expert testimony in violation of Federal Rule 26 and Local Rule 26.2(C), and requests that this Court exclude the testimony and all references thereto. (Doc. 131 at 6).

Pen-Tech separately filed a Motion for Attorneys' Fees and Costs Under 35 U.S.C. § 285, 28 U.S.C. §1927, and this Court's Inherent Power ("Motion for Fees and Costs," Doc. 123-1). On August 15, 2024, Epic Tech filed its Opposition to Pen-Tech's Motions. (*See* Docs. 127, 128). In its Response to Pen-Tech's Motion for Fees and Costs (Doc. 128), Epic Tech rightly noted that a movant under 35 U.S.C. § 285 must be a "prevailing party" to recover. (Doc. 128 at 2). As a result, Pen-Tech

3

conceded that its Motion was premature and requested that this Court hold in abeyance the 35 U.S.C. § 285 Motion until "such time that this Court or a jury determines that the claims of the '317 Patent are directed to patent ineligible subject matter and are thus invalid under 35 U.S.C. § 101." (Doc. 140 at 1). In the Court's September 23, 2024, Order it retained jurisdiction post-judgment to decide Pen-Tech's Motion for Sanctions and the related motions. (Doc. 143 at 21).

## II.     Discussion

### A.     Epic Tech's Motion to Exclude is Denied

Before considering the pending sanction motions, the Court must first address Epic Tech's Motion to Exclude the testimony of Richard M. Lehrer, Defendant Pen-Tech's lead counsel. (Doc. 131). Epic Tech argues that Mr. Lehrer's Declaration (Doc. 120-3), offered in support of Pen-Tech's Motions for Sanctions Against Epic Tech and Baker Donelson (Doc. 120-1) and Motion for Fees and Costs (Doc. 123), includes "specialized knowledge" not available to lay witnesses. (*Id.* at 3). Specifically, Epic Tech takes issue with Mr. Lehrer's reliance on his expertise as a "patent attorney with 25-years of experience in patent prosecution" in order to "interject himself as a patent and standard of care expert" and opine about the reasonableness of Epic Tech and its counsel's conduct. (*Id.*). As such, Epic Tech argues, Mr. Lehrer's testimony must be considered expert testimony subject to the disclosure requirements in Federal Rule of Procedure 26. (*Id.* at 4). Therefore,

pursuant to Rule 26, Pen-Tech was required to disclose Mr. Lehrer as an expert witness by the close of discovery, on December 20, 2023. (*Id.* at 2). Mr. Lehrer's testimony was not disclosed until more than six months later, on July 14, 2024, when Pen-Tech filed the Motions currently before the Court. (*See* Docs. 120-1, 123-1). Accordingly, Epic Tech requests that the Court exclude Mr. Lehrer's testimony and all references thereto as untimely, pursuant to Federal Rule of Civil Procedure 26(a)(2) and Local Rule 26.2(C). (Doc. 131 at 4–5).

Whether Mr. Lehrer's Declaration should be excluded from this Court's consideration is governed by Federal Rule of Civil Procedure 37. Under Rule 37, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a **motion**, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1) (emphasis added). Rule 26(a) provides that "a party must disclose to the other parties the identity of any witnesses it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Fed. R. Civ. P. 26(a)(2)(A). Rule 26(e) governs a party's ongoing duty to "supplement or correct its disclosure or response" in a timely manner if the party learns that some material respect of the disclosure or response is incomplete or incorrect or if ordered by the court. Fed. R. Civ. P. 26(e). Under Rule 37(c), exclusions are not automatic or mandatory but are a matter within the

5

Court's broad discretion. *Cariobe v. Experian Info. Sols., Inc.*, No. 1:22-CV-02922-TWT-JEM, 2024 WL 3816657, at *7 (N.D. Ga. July 8, 2024) (citing *Henderson v. Ford Motor Co.*, 72 F.4th 1237, 1243 (11th Cir. 2023) for the proposition that "[t]he district court has considerable discretion in determining whether exclusion is proper" under Rule 37(c)(1)).

The Court is not persuaded by Epic Tech's Motion for two reasons. First, Mr. Lehrer's Declaration was filed in support of Pen-Tech's Rule 11 Motion for Sanctions, and referenced throughout its Motion for Fees and Costs, both of which address issues collateral to the merits of this case. (*See* Docs. 120-1, 123-1). So, although Epic Tech cites to Federal Rule of Civil Procedure 26(a) to support its contention that the Mr. Lehrer's Declaration was untimely, that rule clearly pertains to the identities of witnesses a party may wish to call at trial. Fed. R. Civ. P. 26(a). Since Mr. Lehrer's testimony is being offered solely in support of Pen-Tech's motions for sanctions, Rule 26(a) is not applicable, and the disclosure is not untimely. (Doc. 120-3). Second, though the Court acknowledges Epic Tech's argument regarding the propriety of Pen-Tech offering a declaration containing specialized knowledge from a lay witness, the Parties seem to dispute only five of the eighteen paragraphs contained in the Declaration. (Doc. 131 at 3). This is because thirteen of the paragraphs in the Declaration provide identifying information about the declarant, authenticate the attached exhibits, or confirm the

status of discussions between the Parties. (*See* Doc. 120-3; Doc. 138 at 2–3). Since neither Party disputes the authenticity of the exhibits nor contradict any of the fact testimony offered in the Declaration, the Court does not see fit to exclude the Declaration in its entirety. (Doc. 138 at 12–13). Epic Tech identifies paragraphs 11–14 as untimely expert testimony. (Doc. 131 at 3). Pen-Tech states that paragraphs 11–14 are "superfluous, but independently verifiable" and further agrees to "simply withdraw" paragraph 15, which includes an opinion rendered by Mr. Lehrer informed by his knowledge as a registered U.S. Patent Attorney. (Doc. 138 at 10). The Court deems paragraph 15 withdrawn and will disregard it. Otherwise, Epic Tech's Motion to Exclude is denied.

### B.    Federal Rule of Civil Procedure 11

Under Rule 11, an attorney who presents a pleading, motion, or other paper in federal court certifies that to the best of the attorney's knowledge, based on a reasonable inquiry, the following is true:

> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary

7

support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b). If it is later determined that the attorney did not comply with Rule 11(b), the Court may impose appropriate sanctions on the "attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). "The purpose of Rule 11 sanctions is to 'reduce frivolous claims, defenses, or motions, and to deter costly meritless maneuvers.'" *Kaplan v. DaimlerChrysler, A.G.*, 331 F.3d 1251, 1255 (11th Cir. 2003) (quoting *Massengale v. Ray*, 267 F.3d 1298, 1302–03 (11th Cir. 2001)). The Eleventh Circuit has found that sanctions are warranted "when a party files a pleading, motion, or paper that (1) is filed in bad faith or for an improper purpose; (2) is based on a legal theory that has no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law; or (3) has no reasonable factual basis." *Tacoronte v. Cohen*, 654 F. App'x 445, 449 (11th Cir. 2016) (citing Fed. R. Civ. P. 11(b)(1)–(3) and *Baker v. Alderman*, 158 F.3d 516, 524 (11th Cir. 1998)). "In deciding whether the signer or the represented party has violated [] Rule 11, a federal district court is required to evaluate whether the motion, pleading or other paper reflected what could reasonably have been believed by the signer at the time of signing." *Aetna Ins. Co. v. Meeker*, 953 F.2d 1328, 1331 (11th Cir. 1992) (citing *Thread Props. v. Title*

8

*Ins. Co. of Minn.*, 875 F.2d 831, 835 (11th Cir. 1989); Advisory Committee Note to Fed. R. Civ. P. 11).

"The court's inquiry focuses on the merits of the pleading gleaned from facts and law known or available to the attorney at the time of filing." *Global Glass Tech., Inc. v. Rsch. Frontiers, Inc.*, No. 8:20-cv-2517-MSS-AEP, 2024 WL 711034, at *13 (M.D. Fla. Feb. 24, 2024) (quoting *Jones v. Int'l Riding Helmets, Ltd.*, 49 F.3d 692, 694 (11th Cir. 1995)). "In deciding whether the claims of a represented party are objectively frivolous, the court must determine whether a reasonable attorney in like circumstances could believe his actions were factually and legally justified." *Global Tech Led, LLC v. Hilumz Int'l Corp.*, No. 2:15-cv-553-FtM-29CM, 2016 WL 7383916, at *2 (M.D. Fla. Dec. 21, 2016) (quoting *Adams v. Austal, U.S.A., L.L.C.*, 503 F. App'x 699, 703 (11th Cir. 2013)) (internal citation and quotation omitted). Only if the court determines that the claims are objectively frivolous does it next evaluate "whether the individual who signed the pleadings should have been aware that they were frivolous; that is whether he would have been aware had he made a reasonable inquiry." *Jones*, 49 F.3d at 695. "The reasonableness of the prefiling inquiry may depend on such factors as how much time for investigation was available to the signer; whether he had to rely on a client for information as to the underlying facts; and whether the paper was based on a plausible view of the law." *Id.*

9

In a patent infringement case, Rule 11 "require[s], at a minimum, that an attorney interpret the asserted patent claims and compare the accused device with those claims before filing a claim alleging infringement." *Q-Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295, 1300–01 (Fed. Cir. 2004). Notwithstanding a finding that Rule 11 has been violated, whether to impose sanctions, and the nature of those sanctions, ultimately rests in the Court's discretion. Fed. R. Civ. P. 11(c)(1), (4).

Pen-Tech moves for Rule 11 sanctions against Epic Tech and Baker Donelson for filing and maintaining its "frivolous claims" against Pen-Tech because Epic Tech and Baker Donelson knew or had reason to know before, and after, filing the Complaint that the Asserted Claims of the '317 Patent were invalid under the modern eligibility standard for 35 U.S.C. §101 established by the Supreme Court in *Alice*. Specifically, in the wake of the Supreme Court's decision in *Alice*, Pen-Tech argues that Epic Tech and Baker Donelson should have conducted a pre-suit validity analysis of the Asserted Claims. Pen-Tech relies on three main arguments to support its claims. First, Pen-Tech argues that circumstances dictated that a 35 U.S.C. § 101 pre-suit analysis of the subject matter eligibility of the Asserted Claims was required because the '317 Patent issued before the applicable standard of law changed and Epic Tech and Baker Donelson knew that the USPTO vicariously rejected claims 1–17 of the '317 Patent under 35 U.S.C. § 101. (Doc. 120-1 at 12–21). Second, Pen-Tech asserts that Epic Tech knew the Asserted Claims were invalid.

10

(*Id.* at 21). Third, Pen-Tech asserts that Baker Donelson knew that the Asserted Claims were invalid. (*Id.* at 22).

In response, Epic Tech argues that: Pen-Tech's Motion is untimely, Pen-Tech failed to strictly comply with Rule 11, and that Epic Tech's pre-suit investigation was reasonable under the circumstances. (Doc. 127 at 2–4). After careful consideration of the Parties' arguments, the Court determines that Rule 11 sanctions against Epic Tech and Baker Donelson are not warranted.

In its Motion, Pen-Tech asserts that: (1) Epic Tech's five failed attempts at securing additional protection for the claims of the '317 Patent should have been sufficient to place Epic Tech and Baker Donelson on notice that a pre-suit analysis was not only reasonable under the circumstances, but required, (2) the CEO of Epic Tech, Erik Nordin, was aware that the claims of the '317 Patent were "not directed to patentable subject matter," and therefore knew the claims were invalid, (3) Baker Donelson, as the firm on record on at least three separate occasions where the claims were rejected under 35 U.S.C. §101, was on notice that a pre-suit analysis under 35 U.S.C. § 101 was required under the circumstances. (Doc. 120-1).

In light of this Court's September 23, 2024, Order granting Pen-Tech's Motion for Summary Judgment, Pen-Tech's allegations have considerable credence, nonetheless, this Court is not prepared to color Epic Tech's conduct— and by extension, Baker Donelson's—as "frivolous." *See Aqua EZ, Inc. v. Resh, Inc.,*

11

No. 1:23-cv-790-MLB, 2024 WL 4253343, at *4 (N.D. Ga. Sept. 10, 2024) (citing *McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552, 1563-64 (11th Cir. 1992)). Epic Tech represents that it conducted a "good faith, pre-suit investigation." (Doc. 127 at 7). Specifically, Epic Tech provided witness testimony from Jason Queen, Epic Tech's 30(b)(6) Representative and Director of Information Technology, who testified about his role in Epic Tech's investigation. (*Id.*). Additionally, Epic Tech contends that Baker Donelson, too, met its pre-suit investigation obligations by creating a claim chart and a cease and desist letter using images from Epic Tech's pre-suit investigation. (*Id.* at 9). Though Pen-Tech asserts that a different pre-suit obligation existed, the case law it cites suggests the contrary. *See Walther v. McIntosh*, 572 F. App'x 881, 883 (11th Cir. 2014) (affirming the district court's imposition of Rule 11 sanctions against an attorney who performed a wholly insufficient investigation); *Andrew Lechter v. Aprio, LLP*, 622 F. Supp. 3d 1297, 1304 (N.D. Ga. 2022) (explaining that a court should impose sanctions when a party displays "deliberate indifference to obvious facts" that require rejections of the party's position, not merely when a party "used poor judgment in pursuing their allegations"). Pen-Tech, crucially, does not point to any case law outlining the precise investigation Epic Tech and its counsel were purportedly obligated to complete. Thus, the Court cannot say that Epic Tech and Baker Donelson's conduct was so unreasonable as to be frivolous. *Aqua EZ, Inc.*, 2024 WL 4253343, at *4.

12

Additionally, in granting Pen-Tech's Motion for Summary Judgment, the Court had before it the same set of facts that Pen-Tech used to support its instant motion for sanctions.[1] Namely, the Court considered both the district court's vacated opinion in *Epic Tech v. Fusion Skill, Inc.*[2] and the USPTO's prior opinions about the '317 Patent persuasive authority ultimately supporting the Court's analysis declaring the patent invalid. (Doc. 140 at 17–20). But the Court declines to go further. The *Fusion Skill* court found the '315 Patent invalid under § 101, holding that the '315 Patent "flunk[ed]" *Alice* step one because the it "does not claim any novel usage or configuration of computer hardware or software" and it failed step two because it "simply claims the idea of putting two computers next to each other and having the second computer initiate a game if the first computer produces a winning result." *Fusion Skill*, 534 F. Supp. 3d at 745. While the Court recognizes that the *Fusion Skill* court's holding is similar to this Court's September 23, 2024 Order, the issues were not the exact same such that it would be unreasonable for Epic Tech to pursue this litigation. *Aqua EZ, Inc.*, 2024 WL 4253343, at *5. If the Court were to hold to the contrary, parties would not know, going forward,

---

[1] To the extent that Pen-Tech seeks to hold Epic Tech accountable for its failure to respond to Interrogatories 6, 16, and 17, Rule 11 is not the appropriate avenue. *See* Fed. R. Civ. P. 11(d).

[2] 534 F. Supp. 3d 741, 746 (S. D. Tex. 2021), *vacated by consent of the parties*, No. 4:19-CV-02400 (S.D. Tex. July 6, 2022), ECF No. 365.

APPX000013

whether they could protect presumably valid patents from infringement where related patents have been declared invalid. Here, though Pen-Tech may be frustrated at having to engage in years long litigation, the Court cannot say that it did so due to Epic Tech and Baker Donelson's unreasonable conduct.

Finally, as to whether the USPTO prior opinions should have put Epic Tech and Baker Donelson on notice that the '317 Patent was invalid, the Court declines to take such a leap, particularly when no court has found that the prosecution history of a later patent can reach back and limit a claim using the same element in an earlier related patent. Thus, the Court declines to impose sanctions at this point.

### C.    Attorney's Fees Pursuant to 35 U.S.C. § 285

Title 35 § 285 of the United States Code provides that "[t]he court in exceptional cases may award reasonable attorneys fees to the prevailing party." Determining whether a party should be afforded attorney's fees under 35 U.S.C. § 285 requires a two-step inquiry: (1) the court must determine whether the case is "exceptional" and (2) where the court finds the case is "exceptional," the court must determine whether the requested attorney's fees are appropriate. *Cap. Sec. Sys., Inc. v. NCR Corp.*, No. 1:14-cv-1516-WSD, 2018 WL 300549, at *2 (N.D. Ga. Jan. 5, 2018) (citing *Wedgetail Ltd. v. Huddleston Deluxe, Inc.*, 576 F.3d 1302, 1304 (Fed. Cir. 2009)). "[A]n 'exceptional' case is simply one that stands out from others with

14

respect to the substantive strength of a party's litigation position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 575 U.S. 545, 544 (2014). A party need only meet the preponderance of the evidence standard in demonstrating the exceptionality of a case. *Id.* ("Section 285 demands a simple discretionary inquiry; it imposes no specific evidentiary burden, much less a high one. Indeed, patent-infringement litigation has always been governed by a preponderance of the evidence standard."). The Federal Circuit has previously found exceptionality in instances of "inequitable conduct before the PTO, litigation misconduct, vexatious, unjustified, and otherwise bad faith litigation; a frivolous suit or willful infringement." *Wedgetail, Ltd.*, 576 F.3d 1304–05 (collecting cases).

Pen-Tech argues that this case is "exceptional" because Epic Tech and Baker Donelson engaged in unreasonable conduct. Pen-Tech states that Epic Tech and Baker Donelson "each independently knew or reasonably should have known" that the Asserted Claims were invalid under well-established Supreme Court precedent and that their case had no reasonable basis in fact or law. (Doc. 123-1 at 18). Further, Pen-Tech argues that Epic Tech and Baker Donelson employed vexatious litigation tactics including, but not limited to delaying its responses to interrogatories, then refusing to respond after the delay, attempting to file

15

untimely supplemental infringement contentions, and moving for and obtaining multiple extensive extensions of time. (Doc. 123-1 at 19–20). Pen-Tech states that Epic Tech and Baker Donelson acted unreasonably when they forced it to wait until the end of expert discovery to determine that Epic Tech was not going to substantively respond to Interrogatories 6, 16, and 17 related to their knowledge of the Asserted Claims. (*Id.* at 21). Further, Pen-Tech alleges that Epic Tech's CEO testified that Epic Tech knew that the claims were invalid. (*Id.* at 20). Pen-Tech asserts that Epic Tech and Baker Donelson deployed these tactics for the improper purpose of extending the duration of the litigation and multiplying the litigation process and costs. (*Id.*).

Pen-Tech also argues that Epic Tech and Baker Donelson strategically and affirmatively chose to file and maintain suit against Pen-Tech for the purpose of harassment and to cause Pen-Tech to waste money. (*Id.*). As a result, Pen-Tech requests that this Court "utilize its inherent powers to ensure that Epic Tech, Baker Donelson and any similarly motivated Patent Owner and its counsel are deterred from similar behavior in the future." (Doc. 123-1 at 18).

Epic Tech puts forth the following five arguments in response: (1) Pen-Tech's Motion is premature, (2) the Motion is procedurally deficient for failure to comply with Fed. R. Civ. P. 54(d)(2), (3) Pen-Tech has not overcome the presumption that Epic Tech's assertion of infringement of the '317 Patent was

16

made in good faith, (4) the '317 Patent retains its statutory presumption of validity even after *Alice*, and (5) Pen-Tech's prosecution history argument should not control Epic Tech's or the Court's analysis. (Doc. 128 at 18–24). At the time that Pen-Tech filed the 285 Motion, the Court had not yet ruled on the outstanding cross motions for summary judgment. In its September 23, 2024, Order the Court determined that the '317 Patent is invalid as a matter of law for claiming ineligible subject matter and accordingly issued a judgment permitting Pen-Tech to recover the costs of this action. (Docs. 143, 144). Additionally, Pen-Tech conceded in its Reply that "it inadvertently requested fees and costs under 35 U.S.C. § 285 prematurely" and as such requested that the Court hold in abeyance Pen-Tech's Motion. (Doc. 140 at 1). Accordingly, much of Epic Tech's argument in its Response has been rendered moot by this Court's Order and Judgment. Even so, the Court cannot conclude that Pen-Tech has shown that this case is "exceptional" such that it is entitled to fees and costs pursuant to 35 U.S.C. § 285.

The Court does not believe sufficient evidence exists to justify a determination that this case "stands out" from other patent cases. *Octane Fitness, LLC*, 575 U.S. at 544. Throughout the § 285 Motion, Pen-Tech provides only vague assertions regarding Epic Tech and Baker Donelson's prior knowledge of the patent ineligibility of the '317 Patent, but Pen-Tech does not set forth the necessary specifics of their "bad faith" sufficient to warrant an exceptionality determination.

17

(Doc. 140 at 1). Pen-Tech has repeatedly provided this Court with a detailed chronology of Epic Tech's filing of continuation patent applications. (*See* Docs. 120-1, 123-1). The Court has found that the USPTO's prior opinions rejecting related claims of the '317 Patent may provide persuasive value in the prosecution history of a later patent, but the Court is not prepared to hold that it is sufficient to demonstrate that Epic Tech and Baker Donelson pursued the case without a reasonable belief that it had merit. *Cap. Sec. Sys., Inc.*, 2018 WL 300549, at *4. Exceptional cases are "rare." *Raniere v. Microsoft Corp.*, 887 F.3d 1298, 1303 (Fed. Cir. 2018). Therefore, the Court concludes that this case cannot be deemed "exceptional" as defined by the Supreme Court and the Federal Circuit and thus denies Pen-Tech's Motion for Attorney's Fees and Costs Under 35 U.S.C. § 285.

### D. Attorney's Fees Pursuant to 28 U.S.C. § 1927

Title 28 § 1927 of the United States Code provides the following:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorney's fees reasonably incurred because of such conduct.

28 U.S.C. § 1927. The Eleventh Circuit has interpreted the statute to impose three essential requirements for an award of sanctions: (1) "the attorney must engage in unreasonable and vexatious conduct"; (2) "that unreasonable and vexatious

18

conduct must be conduct that multiplies the proceedings"; and (3) "the dollar amount of the sanction must bear a financial nexus to the excess proceedings, *i.e.*, the sanction may not exceed the 'costs, expenses, and attorney's fees reasonably incurred because of such conduct." *Cap. Sec. Sys., Inc.*, 2018 WL 300549, at *4 (quoting *Amlong & Amlong, P.A. v. Denny's Inc.*, 500 F.3d 1230, 1239 (11th Cir. 2007)). The Eleventh Circuit has "consistently held that an attorney multiplies proceedings 'unreasonably and vexatiously' within the meaning of the statute only when the attorney's conduct is so egregious that it is 'tantamount to bad faith.'" *Id.* (quoting *Amlong & Amlong, P.A.*, 500 F.3d at 1239).

Bad faith turns not on the attorney's subjective intent, but on the attorney's objective conduct. *Amlong & Amlong, P.A.*, 500 F.3d at 1239. However, the Eleventh Circuit has made clear that subjective intent is not entirely irrelevant:

> [A] district court may impose sanctions for egregious conduct by an attorney even if the attorney acted without the specific purpose or intent to multiply the proceedings. That is not to say that the attorney's purpose or intent is irrelevant. Although the attorney's objective conduct is the focus of the analysis, the attorney's subjective state of mind is frequently an important piece of the calculus, because a given act is more likely to fall outside the bounds of acceptable conduct and therefore be "unreasonabl[e] and vexatious" if it is done with a malicious purpose or intent.

*Amlong & Amlong, P.A.*, 500 F.3d at 1241. Moreover, "[n]egligent conduct, standing alone, will not support a finding of bad faith under § 1927—that is, an attorney's

conduct will not warrant sanctions if it simply fails to meet the standard of conduct expected from a reasonable attorney." *Id.*

To determine whether the conduct was unreasonable, the district court must compare the attorney's conduct against the conduct of a "reasonable" attorney and make a judgment about whether the conduct was acceptable according to an objective standard. *Id.* at 1240. The term vexatiously similarly requires an evaluation of the attorney's objective conduct. *Id.*; *see Christiansburg Garment Co. v. EEOC*, 443 U.S. 412, 421 (1978) (explaining, in the course of interpreting 42 U.S.C. § 2000e–5(k), that "the term 'vexatious' in no way implies that the plaintiff's subjective bad faith is a necessary prerequisite to a fee award against him"). Thus, an attorney's conduct must be particularly egregious to warrant the imposition of sanctions. *Amlong & Amlong, P.A.*, 500 F.3d at 1242.. The attorney must knowingly or recklessly pursue a frivolous claim or needlessly obstruct the litigation of a non-frivolous claim. *Id.* If the attorney's misconduct meets this high standard, a district court may order the attorney to pay the costs, expenses, and attorney's fees reasonably incurred because of the attorney's misconduct. *Id.*

Here, and considering the Court's discussion regarding Pen-Tech's request for attorney's fees under 35 U.S.C. § 285, the Court cannot conclude that Epic Tech and Baker Donelson's conduct warrants sanctions under 28 U.S.C. § 1927. The

20

Court is unable to find, on the record before it, that the lawsuit was frivolous, or that any party acted in bad faith or in a manner that unreasonably or vexatiously multiplied the proceedings in this action. Epic Tech's reliance on the *Fusion Skill* court's characterization that their argument was "colorable" may have been misguided, but it did not rise to the level of grossly deviating from reasonable conduct. *Id.* at 1240 (citing *Schwartz v. Million Air, Inc.*, 341 F.3d 1220, 1227 (11th Cir. 2003)).

### III. Conclusion

For the reasons above, the Court **DENIES** Plaintiff Epic Tech's Motion to Exclude the Expert Witness Testimony of Richard M. Lehrer (Doc. 131). The Court further **DENIES** Defendant Pen-Tech's Rule 11 Motion for Sanctions (Doc. 120-1) and Motion for Fees and Costs Under 35 U.S.C. § 285, 28 U.S.C. § 1927, and This Court's Inherent Power (Doc. 123-1). Pen-Tech's Motion for Leave to File Matters Under Seal (Doc. 121) is also **DENIED**.

**SO ORDERED** this 7th day of March, 2025.

Victoria Marie Calvert
United States District Judge

21

US008545317B2

(12) **United States Patent**
Mosley et al.

(10) **Patent No.:** **US 8,545,317 B2**
(45) **Date of Patent:** **Oct. 1, 2013**

(54) **GAMING SYSTEM AND METHOD**

(75) Inventors: **Bob Mosley**, Piedmont, SC (US); **Troy Jungmann**, Austin, TX (US)

(73) Assignee: **Gateway Systems, LLC**, Piedmont, SC (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **13/617,105**

(22) Filed: **Sep. 14, 2012**

(65) **Prior Publication Data**

US 2013/0012307 A1      Jan. 10, 2013

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 13/424,630, filed on Mar. 20, 2012.

(60) Provisional application No. 61/566,653, filed on Dec. 4, 2011.

(51) **Int. Cl.**
*A63F 13/12* (2006.01)
*A63F 13/00* (2006.01)
(52) **U.S. Cl.**
USPC .................................. **463/28**; 463/25; 463/42
(58) **Field of Classification Search**
USPC .............................. 463/16, 20, 25, 28, 40–42
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 5,280,909 | A | * | 1/1994 | Tracy | 463/27 |
| 5,779,546 | A | * | 7/1998 | Meissner et al. | 463/25 |

| | | | | | |
|---|---|---|---|---|---|
| 6,110,043 | A | * | 8/2000 | Olsen | 463/27 |
| 6,319,125 | B1 | * | 11/2001 | Acres | 463/25 |
| 6,345,824 | B1 | * | 2/2002 | Selitzky | 273/292 |
| 6,475,088 | B1 | * | 11/2002 | Jones et al. | 463/27 |
| 6,780,105 | B1 | * | 8/2004 | Kaminkow | 463/16 |
| 6,887,154 | B1 | * | 5/2005 | Luciano et al. | 463/26 |
| 6,988,946 | B2 | * | 1/2006 | Michaelson et al. | 463/17 |
| 7,169,041 | B2 | * | 1/2007 | Tessmer et al. | 463/16 |
| 7,311,598 | B2 | * | 12/2007 | Kaminkow et al. | 463/16 |
| 7,419,162 | B2 | * | 9/2008 | Lancaster et al. | 273/292 |
| 2003/0104853 | A1 | * | 6/2003 | Tessmer et al. | 463/16 |
| 2005/0187014 | A1 | * | 8/2005 | Saffari et al. | 463/27 |
| 2005/0239537 | A1 | * | 10/2005 | Ogiwara | 463/17 |
| 2006/0121971 | A1 | * | 6/2006 | Slomiany et al. | 463/16 |
| 2007/0060247 | A1 | * | 3/2007 | Low et al. | 463/16 |
| 2007/0082725 | A1 | * | 4/2007 | Low et al. | 463/16 |
| 2008/0207301 | A1 | * | 8/2008 | Yokota et al. | 463/17 |
| 2008/0214294 | A1 | * | 9/2008 | Yoshizawa | 463/25 |
| 2008/0274783 | A1 | * | 11/2008 | Walker et al. | 463/13 |
| 2008/0305856 | A1 | * | 12/2008 | Walker et al. | 463/25 |
| 2009/0111572 | A1 | * | 4/2009 | Bigelow et al. | 463/21 |

(Continued)

*Primary Examiner* — William M. Brewster
*Assistant Examiner* — Jason Skaarup
(74) *Attorney, Agent, or Firm* — Sutherland Asbill & Brennan LLP

(57) **ABSTRACT**

A secondary game system, in various embodiments, comprises a system of networked game terminals where a player playing a game on a game terminal can earn eligibility to win a prize from a secondary game that plays simultaneously in the background. The secondary game may be triggered based on play on the plurality of networked terminals. This allows the player to play a first game that earns them eligibility to win another game that is played in the background. The player sends a game initiation request for a game (e.g., lottery slot) to be played on the game terminal. If a certain criterion is satisfied, the player becomes eligible to win a prize from the secondary game if the secondary game is triggered while the player is eligible to win.

**22 Claims, 8 Drawing Sheets**



EPIC TECH 000689

**US 8,545,317 B2**

Page 2

(56)        **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2009/0124371 A1* | 5/2009 | Gilmore et al. | 463/27 |
| 2009/0137313 A1* | 5/2009 | Young | 463/31 |
| 2009/0239622 A1* | 9/2009 | Fujimori et al. | 463/20 |
| 2010/0062820 A1* | 3/2010 | Yoshizawa | 463/11 |
| 2010/0120494 A1* | 5/2010 | DeWaal et al. | 463/20 |
| 2010/0124988 A1* | 5/2010 | Amos et al. | 463/27 |
| 2010/0285860 A1* | 11/2010 | Svanas | 463/20 |
| 2012/0034968 A1* | 2/2012 | Watkins et al. | 463/20 |
| 2012/0077569 A1* | 3/2012 | Watkins et al. | 463/25 |
| 2012/0077579 A1* | 3/2012 | Apirian et al. | 463/29 |
| 2012/0077587 A1* | 3/2012 | Apirian et al. | 463/31 |
| 2012/0077588 A1* | 3/2012 | Apirian et al. | 463/31 |

* cited by examiner

EPIC TECH 000690



**FIG. 1**

EPIC TECH 000691



# FIGURE 2

EPIC TECH 000692



## FIGURE 3

EPIC TECH 000693



# FIGURE 4

EPIC TECH 000694



**FIG. 5**

EPIC TECH 000695



FIG. 6A

FIG. 6B

EPIC TECH 000696



**FIG. 6C**



**FIG. 6D**

EPIC TECH 000697



FIG. 6E

APPX000076

EPIC TECH 000698

US 8,545,317 B2

# GAMING SYSTEM AND METHOD

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation-in-part of U.S. patent application Ser. No. 13/424,630, filed Mar. 20, 2012, entitled "Gaming System and Method", which is incorporated herein by reference in its entirety, which claims benefit of priority under 35 U.S.C. §119(e) to the filing date of U.S. Provisional Application No. 61/566,653, as filed on Dec. 4, 2011, which is incorporated herein by reference in its entirety.

## BACKGROUND

Sweepstakes games exist that allow a player to reveal a prize associated with the sweepstakes entry ticket. Electronic sweepstakes games operate to allow a player to reveal the results of a ticket through the use of a visually pleasing display on a computer or other gaming terminal. However, electronic sweepstakes games do not always keep the player engaged. The present system and methods recognize and address the foregoing considerations, and others, of prior art system and methods.

## SUMMARY OF THE INVENTION

A computer-implemented method of allowing a user to play an electronic game on a terminal, in various embodiments, comprises: (1) receiving a request from a player to play a game at a terminal; (2) at least partially in response to receiving the request, facilitating a play of the game at the terminal; (3) at least partially in response to receiving the request from the player, establishing a bonus time period for the player; (4) receiving an indication that play of a second game occurs at a particular point in time; (5) determining if the bonus time period runs coincident with the particular point in time; (6) determining whether play of the second game results in a prize; and (7) if play of the second game results in a prize and the bonus time period runs coincident with the particular point in time, awarding at least a portion of the prize to the player.

In some embodiments, the method further comprises at least partially in response to receiving the request from the player, triggering play of the second game. In other embodiments, the method further comprises at least partially in response to triggering play of the second game, capturing an image of a display associated with a player if the bonus time period for the player runs coincident with the particular point in time, and storing the image on the terminal. In yet other embodiments, the method further comprises notifying the player of the award of the at least a portion of the prize. In yet other embodiments, the method further comprises decrementing the bonus time period for the player. In some embodiments, the method further comprises incrementing the bonus time period for the player when additional requests are received from the player to play the game at the terminal.

In still other embodiments, the method further comprises receiving requests from a plurality of players to play a game. In these embodiments, the method further comprises at least partially in response to receiving the requests from the plurality of players, establishing a bonus time period for at least one or more of the plurality of players. In some of these embodiments, the method further comprises determining if the bonus time periods associated with the one or more of the plurality of players runs coincident with the particular point in time. In these embodiments, the method further comprises awarding at least a portion of the prize to each of the one or more of the plurality of players who have a bonus time period that runs coincident with the particular point in time.

A computer-implemented method of playing a game, in various embodiments, comprises: (1) receiving, from a plurality of players, a plurality of requests to play a game; (2) at least partially in response to receiving the plurality of requests to play the game, facilitating play of the game for each of the plurality of players making a request; (3) at least partially in response to receiving the plurality of requests, awarding a bonus time period to each one of the plurality of players if the request for each of the plurality of players satisfies accordance with a first criterion; (4) receiving an indication that a play of a second game occurs at a particular point in time; (5) determining, for each one of the plurality of players awarded the bonus time period, whether the bonus time period for the each one of the plurality of players is operative concurrent with the particular point in time; and (6) awarding at least a portion of a prize that results from play of the second game to at least one of the each one of the plurality of players awarded the bonus time period that is operative concurrent with the particular point in time.

A computer system for playing games, in various embodiments, comprises at least one processor, and a plurality of terminals operatively coupled to the at least one processor. The at least one processor is configured to: (1) receive a request from at least one player to play a game on one of the plurality of terminals; (2) at least partially in response to receiving the request from the at least one player, facilitate a play of the game on the one of the plurality of terminals; (3) at least partially in response to the request from the at least one player, establish a bonus time period for the at least one player; (3) receive an indication that a play of a secondary game has occurred at a particular point in time, and that the play of the secondary game has results in a prize; (4) determine whether the play of the secondary game occurs during the bonus time period for the at least one player; and (5) at least partially in response to determining that the play of the secondary game has occurred during the bonus time period for the at least one player, award at least a portion of the prize to the at least one player.

## BRIEF DESCRIPTION OF THE DRAWINGS

A full and enabling disclosure of the present invention, including the best mode thereof directed to one of ordinary skill in the art, is set forth in the specification, which makes reference to the appended drawings, in which:

FIG. 1 is block diagram of an exemplary floor configuration in accordance with an embodiment of the present system;

FIG. 2 comprises a flow diagram illustrating an exemplary process performed by the system of FIG. 1 in accordance with an embodiment of the present method;

FIG. 3 comprises a flow diagram illustrating an exemplary process performed by the system of FIG. 1 in accordance with an embodiment of the present method;

FIG. 4 comprises a flow diagram illustrating an exemplary process performed by the system of FIG. 1 in accordance with an embodiment of the present method;

FIG. 5 comprises the contents of a graphical user interface in accordance with one embodiment of the present system and methods; and

FIG. 6A-6E comprise the contents of a graphical user interface for a secondary game in accordance with one embodiment of the present system and methods.

## DESCRIPTION OF SOME EMBODIMENTS

Embodiments of the present system support games structured for all game styles known in the art. In some embodi-

EPIC TECH 000699

US 8,545,317 B2

3

ments, the present games and methods can be used in connection with any Class II and III games. In yet another embodiment, the present games and methods can be used in connection with Class III random number generated (RNG) games, Class III electronic pull tab games, electronic bingo games, lottery-based games, and sweepstakes games. Embodiments of the invention are agnostic to the methods in which the results are delivered.

Overview

Gaming terminals may be standalone type terminals or networked terminals. In either case, a secondary game, as the term is used herein, is a game that is common to all players on a group of gaming terminals and may be played simultaneously in the background. This configuration allows the players on the individual gaming terminals to play a first game that earns them eligibility to potentially win the secondary game that is played in the background, which provides an enjoyable experience for the player and encourages them to continue to play on the gaming terminal.

The secondary game of the present system may be considered a game-in-game. In this regard, according to an embodiment of the system, the secondary game is a game that is linked with a plurality of other game terminals such that play on the plurality of game terminals triggers play of the secondary game. Moreover, a prize from the secondary game is awarded to one or more of the players of the plurality of game terminals based on their eligibility to participate in the winnings of the secondary game play. As a result, the players of the plurality of game terminals may be eligible to win all or a portion of a secondary prize in addition to individual prizes awarded on their respective game terminal.

In one embodiment of the present system, the player may purchase internet time or another product or service, and when this occurs, the player may be issued free entries into a sweepstakes. In some embodiments, the player is issued participation credits that can be redeemed for sweepstakes entries. In either case, the sweepstakes entries may be revealed through an entertaining electronic display that is accessed on one of the plurality of game terminals. In an embodiment, a particular amount of participation credit is redeemed for a sweepstakes ticket, which is revealed through the standard game and a particular amount of participation credit earns the player eligibility time to reveal a sweepstakes ticket as part of the secondary game.

In some embodiments, the player may pay a fee to play the standard game and an additional fee to be eligible to win the secondary game. For example, a player pays a first fee, such as $0.25, to play the standard game, and at the same time pays an additional contribution fee, such as $0.02, to win a prize from the secondary game if the player is eligible to win when the secondary game is played. Thus, players each pay $0.27 to play the standard game, which also enters the player into the secondary game (and thus, makes the player eligible for the secondary winnings round). More detailed descriptions of a system and method of gaming are provided below according to various embodiments.

Exemplary Gaming System

FIG. 1 illustrates a system 100 for providing a secondary game in accordance with an embodiment of the present invention. The system 100 comprises a database 110, a server 120, at least one secondary game terminal 130, one or more game terminals (that may be PC-based) 140, a management terminal 150, a point-of-sale ("POS") device 160, one or more standalone game terminals (that may be any gaming based machine) 170, a video splitter 180, a relatively large monitor or television (secondary screen) 190, or any combination thereof. Those skilled in the art with reference to this disclo-

4

sure should appreciate that other configurations may be used to accomplish the methods described herein without departing from the scope of the present invention. For example, in various embodiments, the game server 120 may be configured to also provide the functionality provide by the secondary game server 130.

It should be understood that each of the computing devices, including the server 120, the at least one secondary terminal 130, the one or more game terminals 140, the management terminal 150, the POS device 160, and the one or more standalone game terminals 170, may each have a computer hardware processor, input and output devices (for example, a computer monitor, a keyboard, selection buttons, and/or mouse) and at least one storage device (for example, memory, hard drives, etc.). These devices may also have network connection cards to connect to the network. At least some of these devices may also include a computer readable medium, which is further described herein.

The secondary game may run asynchronously with an integrated gaming system or as a linked product via SAS to other gaming terminals, in certain embodiments, the secondary game is not intended to be a standalone gaming platform because it is initiated based upon play of the standard game on each gaming terminal connected to the gaming system 100. There are specific integration points between the game server, gaming terminals, and the secondary game server that allows one or more players to participate in playing a game at a terminal while earning eligibility to win on a secondary game.

The server 120 is configured to communicate data from various devices in the system and to perform one or more method steps, as detailed below. The database 110 may contain various types of data and computer instructions for performing at least some of the steps presented herein. Although a single server is indicated for the server 120, and a single database for the database 110, it should be understood that the network may be comprised of multiple servers and databases, whether located locally and networked through a local area network or remotely through a wide area network or an Internet connection. Thus, the single representations at 120 and 110 are provided for purposes of illustration and clarity only and should be understood to represent such other configurations.

The gaming terminals 140 and 170 are illustrated as linked together via a network (which may be via the network shown in FIG. 1 or any additional network). Each gaming terminal may be a standard standalone gaming machine 170, a personal computer (PC) 140 or other computing device (not shown). The gaming terminals 140 and 170 are illustrated in FIG. 1 as separate groups (even though they function similarly and perform the same method steps).

The POS device 160 allows players to buy internet time or another product or service, and play of the gaming terminals could be free with such purchases. In various embodiments, the player may use the POS device 160 to directly load an account card with credits to play games on the gaming terminals. This account card is associated with an account that the player may use to play the game on a game terminal 140, 170 and earn eligibility to win prizes when the secondary game is triggered.

The management terminal 150 may be a device that is operatively connected with the server 120 to initiate, enable, disable or change the secondary game. Other managerial or supervisory operations may also be performed using the management terminal 160.

The secondary terminal 130 controls one or more operations of the secondary game, such as determining results for the secondary game, displaying the secondary game results,

EPIC TECH 000700

US 8,545,317 B2

and/or any other operations as discussed herein. In some embodiments, the secondary terminal 130 is part of the server 120 such that the server 120 performs all or part of the operations of the secondary terminal 130.

A video splitter 180 may be operatively connected to the secondary terminal 130 and/or the network. The video splitter may be used to split any received video feed to multiple secondary screens 190. The secondary screens 190 may be television screens, monitors or other device that displays the secondary game board and other procedures of the secondary game.

One or more of the devices illustrated in FIG. 1 may be connected to a network as previously mentioned. In one embodiment, all devices in FIG. 1 are connected to the network and communicate with each other over the network. It should be noted that the network in FIG. 1 need not be a single network (such as only the internet) and may be multiple networks (whether connected to each other or not). For example, the network may be the internet. In another embodiment, the network may be a local area network ("LAN") and a wide area network ("WAN") (e.g., the Internet) such that one or more devices (for example, server 120, secondary terminal 130, management terminal 150 and database 110) are connected together via the LAN, and the LAN is connected to the WAN which in turn is connected to other devices (for example, the game terminals 140, 170). The terms "linked together" or "connected together" refers to devices having a common network connection via a network (either directly on a network or indirectly through multiple networks), such as one or more devices on the same LAN, WAN or some network combination thereof.

It should be understood that FIG. 1 is an exemplary embodiment of the present system and various other configurations are within the scope of the present system. Additionally, it should be understood that additional devices may be included in the system shown in FIG. 1, or in other embodiments, certain devices may perform the operation of other devices shown in the figure.

Exemplary Technical Platforms

As will be appreciated by one skilled in the relevant field, the present systems and methods may be, for example, embodied as a computer system, a method, or a computer program product. Accordingly, various embodiments may take the form of an entirely hardware embodiment, an entirely software embodiment, or an embodiment combining software and hardware aspects. Furthermore, particular embodiments may take the form of a computer program product stored on a computer-readable storage medium having computer-readable instructions (e.g., software) embodied in the storage medium. Various embodiments may take the form of web-implemented computer software. Any suitable computer-readable storage medium may be utilized including, for example, hard disks, compact disks, DVDs, optical storage devices, and/or magnetic storage devices.

Various embodiments are described below with reference to block diagrams and flowchart illustrations of methods, apparatuses (e.g., systems) and computer program products. It should be understood that each block of the block diagrams and flowchart illustrations, and combinations of blocks in the block diagrams and flowchart illustrations, respectively, can be implemented by a computer executing computer program instructions. These computer program instructions may be loaded onto a general purpose computer, special purpose computer, or other programmable data processing apparatus to produce a machine, such that the instructions which execute on the computer or other programmable data processing apparatus create means for implementing the functions specified in the flowchart block or blocks. The program code may execute entirely on the user's computer, partly on the user's computer, as a stand-alone software package, partly on the user's computer and partly on a remote computer or entirely on the remote computer or server. In the latter scenario, the remote computer may be connected to the user's computer through any type of network, including a local area network (LAN) or a wide area network (WAN), or the connection may be made to an external computer (for example, through the Internet using an Internet Service Provider).

These computer program instructions may also be stored in a computer-readable memory that can direct a computer or other programmable data processing apparatus to function in a particular manner such that the instructions stored in the computer-readable memory produce an article of manufacture that is configured for implementing the function specified in the flowchart block or blocks. The computer program instructions may also be loaded onto a computer or other programmable data processing apparatus to cause a series of operational steps to be performed on the computer or other programmable apparatus to produce a computer implemented process such that the instructions that execute on the computer or other programmable apparatus provide steps for implementing the functions specified in the flowchart block or blocks.

Accordingly, blocks of the block diagrams and flowchart illustrations support combinations of mechanisms for performing the specified functions, combinations of steps for performing the specified functions, and program instructions for performing the specified functions. It should also be understood that each block of the block diagrams and flowchart illustrations, and combinations of blocks in the block diagrams and flowchart illustrations, can be implemented by special purpose hardware-based computer systems that perform the specified functions or steps, or combinations of special purpose hardware and other hardware executing appropriate computer instructions.

Exemplary Gaming Methods

The gaming terminals 140, 170, server 120, and secondary server 130 may alone, or in combination, perform the method steps of FIGS. 2-4. Moreover, the method steps described in FIGS. 2-4 are examples of various embodiments of the present system and methods. It should be understood by reference to this disclosure that these methods describe exemplary embodiments of the methods steps carried out by the present system, and that other exemplary embodiments may be created by adding other steps or by removing one or more of the methods steps described in FIGS. 2-4.

FIG. 2 depicts an exemplary method for playing a game on a terminal 140, 170 to become eligible to win a prize from the play of a secondary game that begins at step 200 when, for example, one or more players press or activate a spin or reveal button 306 (FIG. 5) on the gaming terminals 140, 170. At step 202, the system 100 receives a request from a player to play a game, for example, at a gaming terminal 140, 170. At least partially in response to receiving the request, at step 204, the system 100 facilitates play of the game at the game terminal. At step 206, the system 100 establishes a bonus time period for the player.

In various embodiments, a bonus time period is established if a player initiates a game play during a defined period of time. In some embodiments, the system 100 displays a countdown timer 302 (FIG. 5) that provides the player an indication of the time remaining for the player to spin to become eligible to earn a bonus time period. In still other embodiments, a second visual indicator 304 displays a particular color (such as green) when the countdown timer has a first amount of time

EPIC TECH 000701

US 8,545,317 B2

7

remaining, turns a different color (such as yellow) when the countdown timer has a second amount of time remaining that is less than the first amount of time, and turns another color (such as red) when no time remains to earn a bonus time period.

In some embodiments, the bonus time period may be a predetermined amount of time, for example, fifteen seconds of eligibility. Thus, from the time of the spin (e.g., request to play the game at the terminal **140**, **170**), the player remains eligible to participate in the secondary game until the bonus time period decrements to zero. In various other embodiments, the bonus time period may be five seconds of eligibility time, and the eligibility time may accumulate each time the player submits a request to play the game at terminal **140**, **170**. In some of these embodiments, the player may accumulate an unlimited amount of time by submitting additional requests to play the game at terminal **140**, **170**, in five second increments. In other embodiments, the system **100** may cap the accumulated time of eligibility to participate in the secondary game to a predetermined upper limit (e.g., twenty-five seconds). In all of these embodiments, the bonus time period decrements in one second increments whether the bonus time period is a fixed amount or accumulates as the player continues to play the game.

At step **208**, the system **100** receives an indication that play of a second game occurs at a particular point in time. At step **210**, the system **100** determines if the bonus time period for the player runs coincident with the particular point in time. The second game can be triggered to play using any suitable means. For example, in various embodiments, play of the second game may be partially in response to receiving the request to play the game at terminal **140**, **170** by the player. Thus, in these embodiments, secondary server **130** may assign a random number of spins as a trigger for play of the secondary game, and the system **100** decrements a counter for each request that is received to play a game at terminals **140**, **170**. Once the counter reaches zero, play of the secondary game is triggered. In some embodiments, the random number of spins may be selected between a predetermined minimum and maximum number. In this way, play of the secondary game occurs at random times based on the random number of spins selected as the trigger, and the volume of play that occurs at game terminals **140**, **170**.

At step **212**, the system **100** determines whether play of the secondary game results in a prize. If no prize is awarded, the method of play ends at step **218**. Otherwise, if the bonus time period for the player runs coincident with the particular point in time, then the system **100** awards at least a portion of the prize to the player. In some embodiments, the prize may be a shared prize where a portion of the prize is awarded to other players who had a bonus time period that runs coincident with the particular point in time. In still other embodiments, if the prize is not a shared prize, the system **100** may randomly choose one player from a plurality of players that have a bonus time period that runs coincident with the particular point in time and award the prize to that player.

The method of play ends at step **218**. In various embodiments, if the sweepstakes game has not terminated (e.g., the fixed number of sweepstakes draws is not depleted by play of the secondary game), the method restarts at step **200** and continues until the sweepstakes game is completes.

FIG. **3** depicts another embodiment of a method of playing a game at a game terminal **140**, **170** that may earn the player the ability to win an additional secondary game that begins at step **220**. For example, the game may begin when one or more players press or activate the spin or reveal button **306** (FIG. **5**) on the gaming terminals **140**, **170**. At step **222**, the system **100**

8

receives, from a plurality of players on the terminals **140**, **170** a plurality of requests to play a game on the individual terminals. At step **224**, at least partially in response to receiving the plurality of requests to play the game, the system **100** facilitates play of the game for each of the plurality of players making the request.

At step **226**, the system **100** checks to see if each request satisfies a first criterion. In various embodiments, the first criterion may be submitting a request to play the game within a predetermined time period. For example, the system **100** may require that the request to play a game on one of the terminals **140**, **170** be submitted before the countdown timer **302** decrements to zero. If a submitted request does not satisfy the first criterion, then the player making the request will not be eligible to participate in the secondary game, and can only play the game on the terminal **140**, **170**. Once the play of the game ends, the method for that player restarts at step **220**. If, on the other hand, the request satisfies the first criterion, then at least partially in response to receiving the plurality of requests, at step **230**, the system **100** awards a bonus time period to each of the plurality of players whose request satisfies the first criterion.

In some embodiments, at step **232**, the system **100** determines whether each of the plurality of players who were awarded a bonus time period submits additional requests to play the game on terminals **140**, **170**. If additional requests are made by one or more of the plurality of players, at step **234**, the system **100** increments the bonus time period for each of those players by a predetermined amount of time. In still other embodiments, instead of incrementing the bonus time period for a player making an additional request, the system **100** may reset the bonus time period for that player to a predetermined amount of time each time that player submits an additional request to play the game on terminal **140**, **170**.

At step **236**, the system **100** receives an indication that play of the secondary game occurs at a particular point in time. The system **100** may trigger play of the secondary game based on one or more factors. For example, in various embodiments, the system **100** may trigger play of the secondary game based on the number of requests received in step **222** that results in the award of a bonus time period in step **230**. In other embodiments, play of the secondary game may be triggered at a particular time. For example, the system **100** may trigger play of the secondary game at a randomly selected time interval. In still other embodiments, play of the secondary game may be triggered based on the requests made to play a game at each of the game terminals **140**, **170** regardless of whether the request results in earning a bonus time period for the player making the request.

At step **238**, the system **100** determines, for each of the plurality of players awarded the bonus time period, whether the bonus time period for each of those players was operative concurrent with the particular point in time when play of the second game occurs. In various embodiments, the system **100** captures and records information regarding those players who have a bonus time period that is operative concurrent with the particular point in time, and displays an indicator on the player's respective terminal to notify the player that the play of the second game is occurring and that the player is eligible to participate. For example, an indicator may be displayed on a terminal display **300** (FIG. **5**) that indicates that the secondary game is triggered and that the player is eligible to win a prize on the secondary game. In various embodiments, the system **100** may display several indicators on the gaming terminals **140**, **170**, such as a blinking border around the display **300** (FIG. **5**) and a display element in the form of a lock to indicate that the player is eligible to win the

EPIC TECH 000702

US 8,545,317 B2

9

second game (e.g., the secondary game). In still other embodiments, the game server **120** records information regarding each player who has a bonus time period operative concurrent with the point in time in database **110** so that the system can award the prize to players.

At step **240**, the system **100** determines if a prize results from play of the second game and, if a prize does result, at step **242**, the system **100** determines whether the prize is a shared prize or an individual prize. At step **244**, if the prize is an individual prize, then in various embodiments, the system **100** randomly selects one player from the plurality of players that have a bonus time period that is operative concurrent with the particular point in time and awards the prize to that player. If, on the other hand, the prize is a shared prize, at step **246**, the system **100** awards at least a portion of the prize that results from play of the second game to each one of the plurality of players that have a bonus time period that is operative concurrent with the particular point in time. The method ends at step **248**, and if the sweepstakes associated with the secondary game is not complete, the method restarts at step **220**.

FIG. **4**, illustrates yet another embodiment of a method of playing a game on a plurality of networked terminals **140**, **170** to earn eligibility to win a prize from play of a game (e.g., a secondary game that is common to all of the game terminals). The method begins at step **250** when the system **100** receives a request from at least one player on the one terminal **140**, **170**. At least partially in response to receiving the request from the at least one player, at step **254**, the system **100** facilitates play of the game. At step **256**, the system **100** receives a request from a second player to play a second game on another terminal **140**, **170**. At least partially in response to the second request, at step **258**, the system **100** facilitates play of the second game. At step **260**, at least partially in response to the request from the at least one player, the system **100** establishes a bonus time period for the at least one player. At step **262**, at least partially in response to the request from the second player, the system **100** establishes a bonus time period for the second player.

At step **264**, the system **100** receives an indication that play of a secondary game occurs at a particular point in time. The system, at step **266**, also determines if play of the secondary game results in a prize. At step **268**, if play of the secondary game results in a prize, the system determines whether play of the secondary game occurs during the bonus time period for the at least one player. If play of the secondary game occurs during the bonus time period for the at least one player, then at step **270**, at least partially in response to determining that play of the secondary game occurs during the bonus time period for the at least one player, the system **100** awards at least a portion of the prize to the at least one player. In various embodiments, the system **100**, at step **272**, determines whether play of the secondary game occurs during the bonus time period for the second player. At step **274**, if the system determines that play of the secondary game occurs during the bonus time period for the second player, then at least partially in response to determining that play of the secondary game occurs during the bonus time period for the second player, the system **100** awards at least a portion of the prize to the second player.

In various embodiments, the number of spins that must occur at the plurality of terminals **140**, **170** to trigger play of the secondary game is determined by a random number that is selected within a defined range. The defined range may consist of a minimum spin and a maximum spin count. Thus, in these embodiments, the frequency of play of the secondary

10

game is based on the number of players playing on the plurality of terminals **140**, **170** and the frequency that each player spins.

In various embodiments, the secondary game configuration can be changed. For example, changes may include a change to: (1) the date of the promotion, (2) the maximum and minimum spin speeds for the secondary game, (**3**) the secondary accumulators, (4) the contribution values or fees that each player pays to become eligible to win the secondary game, (5) the base values of any of the secondarys or (6) any other change in the secondary game. In various embodiments where changes are made to the fee to earn eligibility for the secondary game, the game terminals **140**, **170** cache information regarding the change and may make graphical adjustments to the information displayed to the players.

Exemplary User Experience

The operation of exemplary embodiments of the standard game and the secondary game are perhaps best understood by reviewing particular examples. The following examples describe the experience of the player while playing the standard game and the secondary game. In the examples described herein, the game on terminal **140**, **170** and the secondary game are sweepstakes games. However, it should be understood that the methods and systems described herein also apply to other types of games such as Class III standalone game terminals.

User Experience at a Game Terminal

Referring to FIG. **5**, a player logs into a game terminal **140**, **170** by entering a pin number, swiping a player magnetically-encoded card, inserting cash to a bill acceptor on a standalone game terminal or by any other suitable method to activate or associate some account or player with the game terminal **140**, **170**. The game terminals **140**, **170** access database **110** to determine if there are any credits or fees required to play the game, and if so, displays the fees at **308**. The player manually initiates the standard game by activating the appropriate button (e.g., the "Reveal" button or other button) **306**. The initiation request (including any participation credits or contribution fees) is transmitted to game server **120** for processing. If required, the fees or credits are transferred from the account of the player (whether the account is a cash account on the game terminal or an account associated with the user's entered card) to the game server **120** in order to play the game.

As discussed above, the player must maintain at least one spin within the preconfigured eligibility timer **302** or they will become ineligible for the secondary game. Also, in various embodiments, the player may accumulate eligibility time for the secondary game with each spin of the game at terminal **140**, **170**. In various embodiments, each time the player initiates game play on terminal **140**, **170**, the system automatically resets the eligibility timer **302** and initiates a new count down from a predetermined time.

If the player does not hit the reveal button before the eligibility timer **302** "times out," the player will be ineligible to win the secondary game if the secondary game triggers before the player once again becomes eligible to win the secondary game. The player's ineligibility status is saved at the game server **120**, and the game terminal **140** notifies the player of ineligibility by placing "ineligible" at the top of the display screen **300**. Ineligible players cannot win a prize from the secondary game if the secondary game triggers while they are ineligible, but they can still play the game on the game terminal **140**, **170**.

When the player presses the reveal button **306**, the game terminal **140**, **170** send the request to the game server **120**, the game server pulls a play from a fixed number of electronic sweepstakes tickets and returns a result of the ticket to the

EPIC TECH 000703

US 8,545,317 B2

11

game terminal **140**, **170**. The game terminal **140**, **170** evaluates the received result and initiates a reel spin to display a combination of symbols on screen **300** that corresponds to the result received from the game server **120**. In various embodiments, one or more symbol combinations for each prize result is stored in the database **110**, or in local memory in terminals **140**, **170**, and the game terminal **140**, **170**: (1) retrieves a symbol combination for the prize, (2) assigns a symbol to each respective reel and (3) stops the reels from left to right, one at a time, until one symbol is displayed for each of the reels.

In various embodiments, multiple combinations of reel positions are assigned to each prize level. Thus, the game terminal **140**, **170** may randomly choose from among the multiple combinations of reel positions for any one prize level to present the player with varying displays for each prize. In this way, the display associated with any one prize level changes from play to play to make game play more interesting to the player. The system **100** provides an indication **310** of the winnings for the current spin and increments the user's sweepstakes points **312** by the awarded prize. The display **300** may also include a "total prizes" counter **314** that provides the player with an indication of the total prizes won by that player. Play continues in response to additional requests until all of the tickets for the sweepstakes have been depleted. Once the sweepstakes ends, a new sweepstakes begins.

User Experience for the Secondary Game

Referring to FIG. **6**A, the secondary game display **190** is shown displaying an attract message **316** that the players will see when they enter the gaming area. The attract message can be used to indicate to potential players that the game terminals **140**, **170** are part of a secondary game system. Referring to FIG. **6**B, the secondary display **190** is shown displaying prize structure **318** for the secondary game. In various embodiments, the secondary game may have a prize structure that includes a top level shared prize **320**, an intermediate level shared prize **322** and a low level individual prize **324**. It should also be understood from reference to this disclosure that the number of prize levels for the secondary game can vary. Thus, in some embodiments, the secondary game may have four prize levels—a top level shared prize, a top level intermediate shared prize, a low level intermediate individual prize and a low level individual prize.

The top level prize **320** and the intermediate level prize **322** may start at predetermined level and increase as players play games on the individual game terminals **140**, **170**. Thus, a portion of the fee or points that is paid by the players to be eligible to win the secondary game is added to the top and intermediate level prizes thereby increasing these prize levels over time.

Referring to FIG. **6**C, the secondary display **190** is shown displaying a notice **326** that indicates to all of the players that play of the secondary game has been triggered. In various embodiments, the notice is a countdown timer that indicates the number of seconds until the reels on the secondary display is spun to display the results. Once play of the secondary game is triggered, the secondary game server selects an electronic ticket from a fixed number of electronic tickets associated with the sweepstakes game for the secondary game. Based on the selected electronic ticket, the secondary game server **130** determines the result associated with the electronic ticket and the corresponding symbols associated with the result. In various embodiments, the secondary game server **130** follows a similar procedure as the game terminals **140**, **170** in choosing the reel display that corresponds to the result. In particular, game server **130** may select one combination of symbols from a plurality of symbol combinations

12

available for any given result. The various symbol combinations may be stored locally on secondary game server **130** or in database **110**.

FIG. **6**D illustrates the secondary game reels **328** as they spin. The potential prize amounts **320**, **322** and **324** are also displayed under the reels **328**. As indicated above, play of the secondary game, in various embodiments, is triggered based on the players' request to play games on terminals **140**, **170**. Actual play of the secondary game is carried out by secondary game server **130**, and the results are displayed on the secondary game display **190**, which is viewable by all participants.

Referring to FIG. **6**E, the reels **328** stop in accordance with the selected symbols that are associated with the prize result. In the example shown, the resultant prize is the top level shared prize **320**. As a result, the reels **328** display three 7's and a "congratulations" message to indicate that play of the secondary game resulted in a prize. In the case of the top level shared prize, the prize amount is split evenly among all players on game terminals **140**, **170** that were eligible to win the secondary game when the game was triggered.

Alternate Embodiments

In various embodiments, system **100** awards prizes in money. In other embodiments, the prizes may be awarded in the form of points, internet time, gaming play credits or products. In alternate embodiments, the award of prizes may be carried out by a cashless implementation or directly to the game terminals **140**, **170**. For example, if a player wins a prize, the game terminal of that player may receive a monetary credit or the player's account may increase by the prize amount. Moreover, in various embodiments, transactions associated with prize awards may be stored in database **110** for later reference.

In the embodiments described herein, the games played on the game terminal **140**, **170** and the secondary game are in the form of an electronic slot machine with reels. In alternate embodiments, the games played may include bingo, lottery, Keno or poker. In various embodiments, the game terminal may have a plurality of games that a player may choose from when the player logs into the terminal.

What is claimed is:

1. A computer-implemented method of allowing a user to play an electronic game on a terminal, said method comprising:

  a. receiving a request from a player to play a game at a terminal;

  b. at least partially in response to receiving the request, facilitating play of the game at the terminal;

  c. at least partially in response to receiving the request from the player, establishing a bonus time period for the player;

  d. receiving an indication that play of a second game occurs at a particular point in time;

  e. determining if the bonus time period runs coincident with the particular point in time;

  f. determining, while the player is playing the first game, whether play of the second game results in a prize; and

  g. if play of the second game results in a prize and the bonus time period runs coincident with the particular point in time, awarding at least a portion of the prize to the player, wherein once the second game is triggered to play, a server conducts all play of the second game without input from the player until play of the second game is terminated.

2. The computer-implemented method of claim **1**, further comprising at least partially in response to receiving the request from the player, triggering play of the second game.

EPIC TECH 000704

US 8,545,317 B2

**13**

3. The computer-implemented method of claim **2**, further comprising at least partially in response to triggering of the second game:

a. capturing an image of a display associated with the player if the bonus time period runs coincident with the particular point in time; and

b. storing the image on the terminal.

4. The computer-implemented method of claim **1**, further comprising notifying the player of the award of the at least a portion of the prize.

5. The computer-implemented method of claim **1**, further comprising decrementing the bonus time period for the player.

6. The computer-implemented method of claim **5**, further comprising incrementing the bonus time period for the player when additional requests are received from the player to play the game at the terminal.

7. The computer-implemented method of claim **1**, further comprising receiving requests from a plurality of players to play a game.

8. The computer-implemented method of claim **7**, further comprising at least partially in response to receiving the requests from the plurality of players, establishing a bonus time period for at least one or more of the plurality of players.

9. The computer-implemented method of claim **8**, further comprising determining if the bonus time periods associated with the one or more of the plurality of players runs coincident with the particular point in time.

10. The computer-implemented method of claim **9**, further comprising awarding at least a portion of the prize to each of the one or more of the plurality of players who have a bonus time period that runs coincident with the particular point in time.

11. A computer-implemented method of playing a sweepstakes game, the method comprising:

a. receiving, from a plurality of players, a plurality of requests to play a sweepstakes game;

b. at least partially in response to receiving the plurality of requests to play the sweepstakes game, facilitating play of the sweepstakes game for each of the plurality of players making a request by selecting an electronic sweepstakes draw from a fixed number of electronic sweepstakes draws associated with the sweepstakes game for each one of the respective plurality of requests;

c. at least partially in response to receiving the plurality of requests, awarding a bonus time period to each one of the plurality of players if the request for each of the plurality of players satisfies a first criterion;

d. receiving an indication that a play of a second sweepstakes game occurs at a particular point in time, wherein

i. play of the second sweepstakes game comprises selecting at least one electronic sweepstakes draw from a fixed number of electronic sweepstakes draws associated with the second sweepstakes game, and

ii. wherein the at least one sweepstakes draw may result in a nonzero prize;

e. determining, for each one of the plurality of players awarded the bonus time period, whether the bonus time period for the each one of the plurality of players is operative concurrent with the particular point in time; and

f. awarding at least a portion of a prize that results from play of the second sweepstakes game to at least one of the each one of the plurality of players awarded the bonus time period that is operative concurrent with the particular point in time.

**14**

12. The computer-implemented method of claim **11**, further comprising incrementing each awarded bonus time period by a fixed amount of time for each additional respective request from each one of the plurality of players to play the sweepstakes game.

13. The computer-implemented method of claim **11**, further comprising resetting the bonus time period to a fixed amount of time for each additional respective request from each one of the plurality of players to play the sweepstakes game.

14. The computer-implemented method of claim **11**, wherein the awarding at least a portion of the prize further comprises randomly selecting the at least one from the each one of the plurality of players awarded the bonus time period that is operative concurrent with the particular point in time.

15. The computer-implemented method of claim **11**, wherein the first criterion further comprises receiving the request before a respective time counter for each of the plurality of players decrements to zero.

16. The computer-implemented method of claim **13**, wherein the respective time counter for each of the plurality of players changes color as the respective time counter decrements to zero.

17. The computer-implemented method of claim **11**, wherein the prize is a shared prize.

18. A computer system for playing games comprising

a. at least one processor; and

b. a plurality of terminals operatively coupled to the at least one processor;

wherein the at least one processor is configured to:

i. receive a request from at least one player to play a game on one of the plurality of terminals;

ii. at least partially in response to receiving the request from the at least one player, facilitate play of the game on the one of the plurality of terminals;

iii. at least partially in response to the request from the at least one player, establish a bonus time period for the at least one player;

iv. receive an indication that play of a secondary game has occurred at a particular point in time, and that play of the secondary game results in a prize;

v. determine whether play of the secondary game occurred during the bonus time period for the at least one player; and

vi. at least partially in response to determining that play of the secondary game has occurred during the bonus time period for the at least one player, award at least a portion of the prize to the at least one player, wherein a sum of all prizes awarded in the secondary game may total an amount that is less than a total amount of a prize pool associated with the secondary game.

19. The computer system of claim **18**, wherein the at least one processor is further configured to:

a. receive a request from a second player at another one of the plurality of terminals to play a second game;

b. at least partially in response to the request from the second player, facilitate a play of the second game on the another one of the plurality of terminals; and

c. at least partially in response to the request from the second player, establish a second bonus time period for the second player.

20. The computer system of claim **19**, wherein the at least one processor is further configured to:

a. determine whether the play of the secondary game occurs during the second bonus time period; and

APPX000083

EPIC TECH 000705

US 8,545,317 B2

15

16

b. at least partially in response to determining that play of the secondary game occurs during the second bonus time period, award at least a portion of the prize to the second player.

21. The computer system of claim 19, wherein the at least one processor is further configured to increment the bonus time period by a fixed amount of time for each additional request received from the at least one player.

22. The computer system of claim 19, wherein establishing the bonus time period further comprises determining whether the at least one player submits the request within a predetermined amount of time.

* * * * *

EPIC TECH 000706

### UNITED STATES PATENT AND TRADEMARK OFFICE
#### Certificate

Patent No. 8,545,317 B2                                        Patented: October 1, 2013

On petition requesting issuance of a certificate for correction of inventorship pursuant to 35 U.S.C. 256, it has been found that the above identified patent, through error and without any deceptive intent, improperly sets forth the inventorship.

Accordingly, it is hereby certified that the correct inventorship of this patent is: Bob Mosley, Piedmont, SC (US); Troy Jungmann, Austin, TX (US); and Robert Weatherby, Celina, TX (US).

Signed and Sealed this Eleventh Day of November 2014.

DMITRY SUHOL
*Supervisory Patent Examiner*
Art Unit 3716
Technology Center 3700

EPIC TECH 000707

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 28.1(e)(2)(A), because it contains 7525 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word, in 14 Point Century.

June 24, 2025

/s/ Richard M. Lehrer  
Richard M. Lehrer (RL2498)  
FISHERBROYLES, LLP  
361 Pharr Rd. NE Unit 113  
Atlanta, GA 30305  
(845) 519-9525  
Richard.Lehrer@FisherBroyles.com

Alastair J. Warr  
FISHERBROYLES, LLP  
203 N. LaSalle Street, #2100  
Chicago, IL 60601  
(317) 407-5260  
Alastair.Warr@FisherBroyles.com

*Counsel for Appellant*

Case Number:          25-1624

Short Case Caption:    Epic Tech, LLC v. Pen-Tech Associates, Inc.

I hereby certify that on June 24, 2025, I caused the

CORRECTED PRINCIPAL BRIEF OF PEN-TECH ASSOCIATES, INC.

and the ADDENDUM to be filed with the Clerk of Court using the

CM/ECF system, which automatically will send an electronic mail

notification to the following attorneys of record:

L. Clint Crosby
ccrosby@bakerdonelson.com
Baker, Donelson, Bearman, Caldwell
& Berkowitz, PC

I also hereby certify that on June 24, 2025, I caused the

CORRECTED PRINCIPAL BRIEF OF PEN-TECH ASSOCIATES, INC.

and the ADDENDUM to be sent via electronic mail to the following

attorneys:

Bishop Tyler tbishop@bakerdonelson.com
Jordana Oppenheim joppenheim@bakerdonelson.com
Taylor Buettner joppenheim@bakerdonelson.com
Baker, Donelson, Bearman, Caldwell
& Berkowitz, PC

/s/ Richard Lehrer
Richard Lehrer (RL2498)